DARLENE DEZELAN, individually, on
behalf of the Cedars-Sinai Medical Center
403(b) Retirement Plan, and on behalf of all
similarly situated Plans,
     Plaintiff,

No. 3:16-cv-1251

v.

VOYA RETIREMENT INSURANCE AND
ANNUITY COMPANY,
     Defendant.

**RULING ON DEFENDANT'S MOTION TO DISMISS**

Ms. Darlene Dezelan ("Ms. Dezelan" or "Plaintiff"), brings this putative class action against

Voya Retirement Insurance and Annuity Company ("Voya" or "Defendant"), concerning retirement

funds that Voya managed on Ms. Dezelan's behalf. She brings claims under the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq*., on behalf of the Cedars-Sinai

Medical Center 403(b) Retirement Plan, in which she was a participant, as well as all other ERISA-

covered employee pension benefit plans whose assets were invested in similar funds managed by

Voya. Before the Court is Voya's motion to dismiss. For the reasons that follow, Voya's Motion is

GRANTED. Ms. Dezelan's Complaint is dismissed without prejudice to refiling.

I. **Factual Allegations**

Voya, a legal reserve insurance company authorized under the insurance laws of New York,

is based principally in Windsor, Connecticut. Compl. ¶ 8. Voya offers and sells Group Annuity

Contracts to retirement plans, including the Cedars-Sinai Medical Center 403(b) Retirement Plan (the

"Plan"). *Id.* at ¶ 9. Ms. Dezelan, a resident of Los Angeles, California, invests retirement assets

under Voya's Group Annuity Contract ("Contract") with the Cedars-Sinai Plan. *Id*. at ¶ 7.

Ms. Dezelan alleges that Voya "offers and sells" stable value funds. Compl. ¶ 2. Stable

value funds are "one of the most popular investment strategies for pension plans," because "unlike

traditional fixed income or bond funds, stable-value funds are structured … so that the principal and income payments are steady instead of fluctuating." Thomas P. Lemke & Gerald T. Lins, <u>ERISA for Money Managers and Advisors</u> § 2:143 (2016 Ed.) ("Lemke & Lins") (noting that the "protection of principal and interest, even in volatile or troubled markets, is a key attraction of stable-value funds."); *Austin v. Union Bond & Trust Co.*, No. 3:14-CV-00706-ST, 2014 WL 7359058, at *3 (D. Or. Dec. 23, 2014) ("In contrast [to traditional bond funds], an SVF is designed to minimize the impact of market fluctuations."). A key feature of the stable value fund an investor is that she can withdraw from the fund at any time and receive the book value of her investment, even if its market value would be lower. *Id.*

The book value of an investment in a stable value fund is determined by the initial investment as well as "contractually specified … increases in value." *Austin*, 2014 WL 7359058, at *3. A stable value fund contract sets forth a certain rate, usually called a "crediting rate," at which interest is applied to investments in the fund. Lemke & Lins § 2:143. This rate may be lower than the actual rate of return that the fund receives on the assets, so that the fund can "smooth[] portfolio gains and losses over time." *Id.*

## A. Ms. Dezelan's Contract

Ms. Dezelan's Plan invested in a Voya product called "Separate Account 896" (the "Separate Account"), an "individual separate account that invests in broad sectors," using a "strategy … to outperform the Barclays Capital U.S. Aggregate Bond Index by 50 basis points on a rolling three year basis." [1] Contract, p. 19. Under the Contract, the Plan's participants can convert their

---

[1] When it moved to dismiss, Voya attached the Stabilizer Group Annuity Contract ("Contract") between Voya, as successor in interest to ING National Trust, and the Cedars-Sinai Plan, effective July 11, 2007 and renewed in 2014. *See* Contract, Hill Decl. Ex. 1, ECF No. 17-2, at p. 1. For the purposes of this motion, all non-conclusory factual allegations are accepted as true, and all inferences are drawn in favor of the plaintiff, as the nonmovant. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court also considers the Contract and other documents attached to the motion to dismiss, because the Complaint "'relies heavily upon [their] terms and effect,' which renders the document[s] 'integral' to the [C]omplaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

accumulated contributions and interest into annuities.  *Id.* at §§ 5.01; *id.* at § 1.05 (allowing for "(a)

Participant-initiated withdrawals; (b) Participant-directed transfers of their account balances between

Investment Options; (c) Participant loans; or (d) Annuity purchases").

Under the Contract, the Plan deposits funds to Voya, and Voya invests these funds consistent

with certain agreed-upon "investment objectives." *Id.* at §§ 2.01, 2.02; 2.11.  When the assets in the

Separate Account accumulate interest, Voya "credits" a certain portion of that interest to the Interest

Accumulation Fund at the "Crediting Rate." *Id.* at § 2.07.  The Contract guarantees a "minimum …

Crediting Rate, net of any applicable expense charges assessed, of 3.0%." *Id.* at § 2.08.  Between

April 1, 2014 and June 30, 2014, Voya applied a Crediting Rate of 3% to the Separate ACcount. *Id.*

at p. 33.  Under the Contract, Voya also charged investors a fee of 0.75% of the Interest

Accumulation Fund. *Id.* at p. 24.

Under the Contract, "benefit withdrawals," *id.* § 2.16, including annuity purchases, may not

"exceed the balance in the Interest Accumulation Fund." *Id.* at § 2.21.  Similarly, "Employer-Event

Withdrawals," which are withdrawals or transfers "resulting from Employer-level event[s] not in the

ordinary course of business," including "spin-offs," "sales," "mergers," or "layoffs," *id.* at § 1.14, are

paid from "[t]he Separate Account, to the extent of available funds." *Id.* at § 2.26; *id.* at § 1.14

("Employer-Event Withdrawals … are withdrawals from the Interest Accumulation Fund").

If it discontinues its contract with Voya, the Plan can only receive the amount of money in

the Interest Accumulation Fund.  Contract, p. 25 ("Over the Book Value Settlement Phase, we

will pay you the balance of the Interest Accumulation Fund.").  The Contract states that, at the time

of discontinuance, Voya "will retain any amounts remaining under the Separate Account Balance,"

or the "fair market value of the Separate Account," following payment of the Interest Accumulation

Fund. *Id.* at §§ 1.22; 3.06.

In the Contract, Voya "acknowledge[s] that: "if the Plan is subject to [ERISA, Voya is]

acting as a fiduciary, as defined in section 3(38) of ERISA, solely with respect to the management of

Plan funds held in a Separate Account." Contract, § 7.07. It adds that "in all other respects, in exercising our rights, we represent ourselves and not the Plan." *Id.*

### B. The Crediting Rate

The Contract establishes the formula for determining the Crediting Rate. The Contract provides several factors that are relevant to this formula. Contract, pp. 22-23.[2] These include the "IAF," or the "projected balance of the Interest Accumulation Fund." *See* Contract § 1.16; § 1.13. It also considers the "MV," or the projected Separate Account Balance, which "reflect[s] the fair market value of the Separate Account." *Id.* at § 1.22. Finally, it considers the "net effective yield available, on the date we determine the new Credited Rate, on assets similar to those in the Separate Account." *Id.* at p. 23. Generally, Voya states that considers "projections … based on current balances or values available on the date [it] determine[s] the new Credit[ing] Rate, and reasonable assumptions as to cash flows, earnings, and other occurrences" during the Crediting Rate period.

As Ms. Dezelan notes, the Contract gives Voya the ability to change the Crediting Rate formula, and the exhibit in the record only describes the one that it "currently use[s]." Contract § 2.08 ("The Credit[ing] Rate is determined by us. It reflects our assumptions. … The formula we currently use … is described in the attached … exhibit."). Voya may change the Crediting Rate formula or the rate itself with 30 days' advance written notice to participants, but that the change will not apply if a participant gives a discontinuance notice before the change is effective. *Id.* at p. 23.

### C. General and Separate Account Stable Value Funds

Ms. Dezelan refers to two types of stable value funds in her Complaint. "Separate account" stable value funds utilize "a separate account established by [the] bank or insurance company for the sole purpose of holding the invested assets." Lemke & Lins at § 2:143 ("In addition to increased

---

[2] The formula is provided in an Exhibit to the Contract, rather than the Contract itself. Section 2.08 of the 2014 Contract states that "[t]he Credited Rate is determined by us. ... The formula we currently use is described in the attached Credited Rate Determination Exhibit." Contract § 2.08.

flexibility and transparency, the separate account also provides an additional level of comfort because the underlying assets are segregated from those of the bank or insurance company."). In "general account" stable value funds, by contrast, "the underlying assets are held by the bank or insurance company," alongside the bank's other assets. Lemke & Lins § 2:143. In these, "the guarantee obligation is a general obligation of the issuer, backed by its financial strength." *Id.*

The Contract does not refer to Plan assets held in a general account stable value fund, but explains the Plan's separate account fund in more detail. It clarifies that the Separate Account is a "segregated asset account [that Voya] established under Connecticut law." Contract § 1.21 ("Deposits to this contract are allocated to a Separate Account."). Under the Contract, the assets in the Separate Account are "not chargeable with liabilities arising out of any of [Voya's] other business," but are owned by Voya. *Id.* at § 2.14. Indeed, the Contract specifically states that Voya "own[s] the investments held in a Separate Account" and is "not the trustee of such assets." *Id.*

### D. Ms. Dezelan's Allegations

Ms. Dezelan alleges that Voya earns undisclosed profits from the Plan and its participants by depressing the Crediting Rate, so that the value of the Interest Accumulation Fund, and the amount of money available to the Plan, is artificially low. She claims that Voya keeps the difference between the Crediting Rate and the Rate of Return, which she calls the "Spread." With the Crediting Rate set artificially low, Voya can "collect[] hundreds of millions of dollars annually in undisclosed compensation from the retirement plans" by keeping the "Spread." Compl. ¶ 3.

Ms. Dezelan does not allege that she has withdrawn money from the Separate Account or receives annuities from Voya. Rather, her allegations concern the "accumulation phase" of her Plan's Contract. She alleges that Voya breached its fiduciary duties to the Plan during this period, reducing the amount of Plan funds that would eventually be available for her to withdraw. *See Lau v. Metropolitan Life Ins. Co.*, 15-cv-09469 (PKC), 2016 WL 5957687 (S.D.N.Y. Aug. 22, 2016), *3 (explaining, when reviewing a similar investment product, that an ERISA plaintiff can challenge a

contract that provides for guaranteed benefits "during its accumulation phase," even if an exception to ERISA would be applicable "once contractually guaranteed fixed payouts began.") (citing *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 89 (1993)).

Ms. Dezelan emphasizes that Voya "has the sole and exclusive discretion to determine the Crediting Rate for a given Crediting Period," and alleges that it sets the Crediting Rate "well below the internal rate of return." Compl. ¶ 2. Specifically, she references one of Voya's internal audits to allege that the company "earns 6.1% on assets [in the Separate Account] and makes and takes a Spread of as much as 3.2% on assets invested in the stable value funds." *Id.* at ¶¶ 48-49; *see also id.* at ¶ 51 (alleging, with regard to general account plans, that Voya "similarly directly sets and controls the spread … and therefore directly controls its own compensation"). At oral argument, Ms. Dezelan alleged that Voya made similar profits in 2009, 2010, 2011, and 2012, and that the total "Spread" for these years was over twenty million dollars.

Ms. Dezelan also alleges that Voya does not disclose the "Spread" to plans and participants, who "have no way of knowing how much extra, undisclosed profit [Voya] makes on the investment of Plan assets." Compl. at ¶¶ 3, 53. This alleged obfuscation works in concert with the "substantial restrictions and financial penalties on transfers" that Voya imposes on stable value fund plans, to "effectively prevent[] a Plan from terminating a stable value fund." *Id.* at ¶ 21. In this way, "plan fiduciaries are effectively precluded from making determinations concerning the reasonableness of the Crediting Rate," or from replacing their fund with another stable value fund if they determine that Voya's Crediting Rate is unreasonable. *Id.* at ¶ 25.

Ms. Dezelan also alleges that Voya "likely transfers funds" between the Separate Account and its general account. Compl. ¶¶ 30, 34. She argues that Voya "reserves to itself the right in its sole discretion to determine" whether Plan assets should be held in the [Separate Account] or in Voya's general account. *Id.* at ¶ 21. In exercising this discretion, Ms. Dezelan alleges, Voya "withhold[s] the reserves that are carved out from [Separate Account] assets," reducing the assets

available for Plan participants. *Id.* at ¶ 33. It also "reserves to itself the right to transfer and in fact transfers funds between the [Separate Account] and [its general account]" at its sole discretion. *Id.* at ¶ 34. At oral argument, Ms. Dezelan clarified that she does not allege that the Contract permits these transfers, but contends that Voya makes them anyway.

### E. The Present Action

Ms. Dezelan makes three claims against Voya. The essence of all three claims is that Voya unlawfully profited by setting the Crediting Rate for its stable value funds for its own benefit. *See, e.g.* Compl. ¶¶ 72, 87, 94 (describing Voya's "setting and resetting [of] the Crediting Rates applicable to the stable value funds," and "determining the level of its own compensation.").

First, Ms. Dezelan alleges that Voya violated Section 406(a)(1)(C) of ERISA, which provides that a fiduciary shall not cause a plan to engage in a transaction if it knows that the transaction constitutes direct or indirect furnishing of goods or services by a "party in interest to a plan." Compl. ¶¶ 75-85 (citing 29 U.S.C. § 1106(a)(1)(C)). Second, she argues that Voya violated Section 406(b)(1) of the law, which prohibits a fiduciary from "deal[ing] with plan assets in his own interest or for his own account." *Id.* at ¶¶ 86-87 (citing 29 U.S.C. § 1106(b)(1)). Finally, she argues that Voya breached the fiduciary duties it owed to the Plan, in violation of Section 404(a)(1). *Id.* at ¶¶ 93-96 (citing 29 U.S.C. § 1104(a)(1)).

Ms. Dezelan seeks to represent a class that includes participants in "all ERISA covered employee pension benefit plans whose plan assets were invested in Voya Retirement Insurance and Annuity Company's Group Annuity Contract stable value funds within the six years prior to, on or after July 26, 2016." Compl. at ¶ 63.

## II. Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To state a plausible

7

claim for relief, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard ... asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In assessing the sufficiency of the complaint, a district court must draw all reasonable inferences in favor of the non-movant. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007). The Court accepts as true all factual allegations in the complaint, "and then determine[s] whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

"Although courts considering motions to dismiss under Rule 12(b)(6) generally must limit [their] analysis to the four corners of the complaint, they may also consider documents that are incorporated in the complaint by reference." *Kermanshah v. Kermanshah*, 580 F.Supp.2d 247, 258 (S.D.N.Y. 2008). This is particularly true if the Complaint "'relies heavily upon [their] terms and effect,' which renders the document[s] 'integral' to the complaint*." Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)); s*ee also Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 222 (2d Cir. 2004) (rejecting allegations that were "belied by the letters attached" to the complaint); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (when reviewing a judgment on the pleadings, courts assume facts alleged are true "unless contradicted by more specific allegations or documentary evidence").

### III. Discussion

Voya moves to dismiss Ms. Dezelan's claims under Rule 12(b)(6). It argues that Ms. Dezelan's claims concerning Voya's general account stable value funds should be dismissed because Ms. Dezelan does not have standing to bring these claims. Ms. Dezelan lacks standing, Voya argues, because Voya did not offer general account products to her Plan, and because she cannot bring this claim on behalf of purported class-members who did invest in these products. Def.'s Mem., 16. Voya also moves to dismiss Ms. Dezelan's claims concerning the Separate Account product in which

she invested, arguing that she fails to state a claim upon which relief may be granted. *Id*. at 14. The Court agrees with both of Voya's arguments.

## A. Voya's General Account Stable Value Funds

Voya argues that Ms. Dezelan's claims concerning its general account stable value funds should be dismissed because it did not offer any general account products in the Cedars Sinai Plan, and because Ms. Dezelan does not have standing to pursue claims concerning plans in which she did not participate. Def.'s Mem., ECF No. 17-1, 16. Ms. Dezelan responds that "courts routinely … certify classes, brought by plaintiffs who did not purchase every product encompassed within a class definition." Opp. Mem., ECF No. 23, 16. Because she has standing to bring her own claims against Voya, Ms. Dezelan argues, she can represent class-members who purchased general account products, even if she herself did not. The Court agrees with Voya. Ms. Dezelan does not have standing to bring her claims concerning Voya's general account products. She also does not have class standing to bring these claims on behalf of potential class members who invested in those products.

### 1. Ms. Dezelan's Standing to Sue

Ms. Dezelan brings all of her claims on behalf of "[a]ll ERISA covered employee pension benefit plans whose plan assets were invested in [Voya]'s Group Annuity Contract Stable Value Funds within the six years prior to, on or after July 26, 2016." Compl. ¶ 63. Voya argues that Ms. Dezelan is statutorily barred from suing on behalf of plans in which she is not a participant, and that she lacks constitutional standing to bring these claims as well. Def.'s Mem., 21.

To bring an ERISA suit, a plaintiff must demonstrate both constitutional standing and a cause of action under ERISA. *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc*., 821 F.3d 352, 359 (2d Cir. 2016) (describing an ERISA cause of action, but noting that the question "does not belong to the family of standing inquiries" because it does not implicate subject-matter jurisdiction).

To demonstrate constitutional standing: "(1) the plaintiff must have suffered an injury-in-fact; (2) there must be a causal connection between the injury and the conduct at issue; and (3) the injury must be likely to be redressed by a favorable decision." *Kendall v. Employees Ret. Plan of Avon Prods*., 561 F.3d 112, 117-18 (2d Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  In an ERISA action, a plaintiff "must allege some injury or deprivation of a specific right" that arose from a violation of a duty created by ERISA.  *Kendall*, 561 F.3d at 121. Generally, a plaintiff has standing to bring an ERISA claim where the plaintiff alleges a causal connection between defendants' actions and actual harm to an ERISA plan in which the plaintiff participates. *See LaRue v. DeWolff, Boberg & Associates, Inc*., 552 U.S. 248, 256 (2008) (recognizing that § 1132(a)(2) "does not provide a remedy for individual injuries distinct from plan injuries").  It is "well established that a plaintiff must demonstrate standing for each claim [s]he seeks to press." *Mahon v. Ticor Title Ins. Co*., 683 F.3d 59, 64 (2d Cir. 2012) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006)).  "[W]ith respect to each asserted claim," therefore, "a plaintiff must always have suffered a distinct and palpable injury to herself." *Id.* (internal citations omitted).

If an ERISA plaintiff brings claims concerning plans in which she did not participate she lacks the requisite redressability or injury-in-fact to give her standing to sue.  *See In re Citigroup Erisa Litig.*, 104 F. Supp. 3d 599, 612-13 (S.D.N.Y. 2015), *reconsideration denied In re Citigroup ERISA Litig*., 112 F. Supp. 3d 156 (S.D.N.Y. 2015), and *aff'd sub nom. Muehlgay v. Citigroup Inc.*, 649 F. App'x 110 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 583, 196 L. Ed. 2d 445 (2016) ("There are no named plaintiffs that qualify as participants or beneficiaries for the Citibuilder Plan. …. Accordingly, the plaintiffs do not have standing to seek relief under the Citibuilder Plan."); *see also In re SLM Corp. ERISA Litig.*, No. 08-4334, 2010 WL 3910566, at *12 (S.D.N.Y. Sept. 24, 2010), *aff'd sub nom., Slaymon v. SLM Corp.,* 506 F. App'x 61, 65 (2d Cir. 2012) (plaintiffs who "have neither participated in nor been beneficiaries of the Retirement Plan" would not benefit from

recovery sought in claims concerning the Retirement Plan—the "repayment of losses"—and

therefore did not have standing to bring those claims) (citing *Connecticut v. Physicians Health Servs.*

*of Connecticut, Inc.*, 287 F.3d 110, 118 (2d Cir.2002) (finding lack of Article III standing because

"[n]one of the remedies being sought would flow to the [plaintiff]")); *Gates v. United Health Grp.*

*Inc.*, No. 11 CIV. 3487 (KBF), 2012 WL 2953050, at *9 (S.D.N.Y. July 16, 2012) (ERISA plaintiff

lacked standing to pursue class action claims "which relate to any ERISA plan … in which she was

not a participant or beneficiary.") (internal citations omitted).

Because Ms. Dezelan did not own any general account stable value funds, she cannot show

that any of Voya's alleged misdeeds concerning those funds caused her to suffer a "distinct and

palpable injury," and therefore lacks standing to bring all three causes of action to the extent that they

relate to those products. *Mahon*, 683 F.3d at 64; *see also Cent. States Se. & Sw. Areas Health &*

*Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 202 (2d Cir. 2005) ("Central

States I") (remanding because "serious questions remain as to whether the Individual Plaintiffs have

demonstrated how [Defendant's] alleged wrongdoings caused any injury to any individual or entity

other than the Plans that [Defendant] contracted with," and noting that the record lacked any

"demonstration of individualized harm.").

An ERISA plaintiff must be a participant or beneficiary of an ERISA-covered plan before

bringing a cause of action. Section 502(a) of ERISA provides that a civil action may be brought "by

a participant or beneficiary" of an ERISA plan. 29 U.S.C. § 1132(a)(1); *see also id.* at § 1132 (a)(3)

(allowing a "participant, beneficiary, or fiduciary" to sue for injunctive relief).[3] "The Supreme Court

has construed § 502 narrowly to allow only the stated categories of parties to sue for relief directly

under ERISA." *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100-01 (2d Cir. 2005); *see also*

*Franchise Tax Bd. v. Construction Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 27 (1983)

---

[3] Ms. Dezelan brings her first claim under § 502(a)(3), 29 U.S.C. § 1132(a)(3), her second under both 502(a)(3) and 502(a)(2), 29 U.S.C. § 1132(a)(2), and her third under 502(a)(2), 29 U.S.C. § 1132(a)(2).

("ERISA carefully enumerates the parties entitled to seek relief under [§ 502(a)(3)]; it does not provide anyone other than participants, beneficiaries, or fiduciaries with an express cause of action."); *Chemung Canal Trust Co. v. Sovran Bank/Maryland*, 939 F.2d 12, 14 (2d Cir.1991) (noting that § 1132(a) "names only three classes of persons who may commence an action," including a participant or beneficiary, the Secretary of Labor, and a fiduciary).

In other words, while "ERISA's goal of deterring fiduciary misdeeds" supports a "broad view of participant standing under ERISA," *Central States I*, 433 F.3d at 200 (internal citations omitted), a claimant must show that she is a participant or beneficiary of the investment plan that she challenges in order to make a claim under Section 502(a) of ERISA. Ms. Dezelan alleges that she was a member of a Plan whose assets were invested in Voya's Separate Account 896. The record does not indicate, however, that her Plan had any relationship to or interest in Voya's general account products.

Ms. Dezelan does not dispute Voya's contention that it did not offer a general account stable value fund through the Cedars Sinai Plan. While her Complaint concerns hypothetical general account products, she does not allege that she was a "participant, beneficiary or fiduciary," *Chemung Canal Trust*, 939 F.2d at 14, of a general account stable value fund, and therefore does not have standing to bring claims concerning these products.

### 2. Class Standing

Ms. Dezelan nevertheless argues that she has "class standing" to pursue her claims regarding Voya's general account stable value funds. Pl.'s Surreply, 2-3. Class standing is appropriate, she argues, because her allegations about the Separate Account product in which she did invest "implicate[] the same concerns as the conduct alleged" about the general account products. *Id.* (citing *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012). The Court disagrees.

Once a putative class representative has established standing to sue a defendant on at least one claim, she can assert "class standing" if she plausibly alleges "(1) that [s]he personally has suffered some actual ... injury because of the putatively illegal conduct of the defendant," thus satisfying Article III standing requirements, and "(2) that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA*, 693 F.3d at 162 (internal citations omitted). This test insures that "the named plaintiff's litigation incentives are sufficiently aligned with those of the absent class members that the named plaintiff may properly assert claims on their behalf." *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 157 (2d Cir. 2014), *cert. denied sub nom. Ret. Bd. of Policemen's Annuity & Annuity & Ben. Fund of City of Chicago v. Bank of New York Mellon*, 136 S. Ct. 796 (2016) ("Retirement Board"). It is "derive[d] from constitutional standing principles [and is] distinct from the criteria that govern whether a named plaintiff is an adequate class representative under Rule 23(a)." *Id.* (citing *NECA*, 693 F.3d at n. 9).

When a claim on behalf of an unnamed class-member involves similar inquiries and proof as the named plaintiff's claim, the "same set of concerns" are implicated and the named plaintiff has class standing to bring the claim. *NECA*, 693 F.3d at 162. In *NECA*, the plaintiff, a large institutional investor, alleged that Goldman Sachs violated the Securities Act by making material misrepresentations in the Offering Documents for certain mortgage backed certificates (the "Certificates") that it issued. *See NECA*, 693 F.3d at 149. Specifically, the plaintiff alleged that Goldman Sachs misrepresented the underwriting guidelines of the lenders who issued the mortgage loans that the investor eventually purchased through the different Certificates. *Id.* The Certificates were sold in seventeen separate offerings using seventeen separate Prospectus Supplements, each of which contained the same "shelf registration statement." *Id.* NECA bought Certificates issued on only two of the offerings, but asserted claims on behalf of the purchasers of Certificates from all seventeen offerings. *Id.*

After noting that *NECA* had "standing to sue defendants in its own right," *NECA*, 693 F. 3d at 158, the court held that *NECA* had class standing to pursue some of its claims concerning Certificates it did not own, because those claims implicated the "same set of concerns" as those of absent class members who did own the Certificates. *See id*. at 164. Specifically, it concluded that NECA had standing to pursue claims concerning Certificates that contained loans originated by the same lenders as those backing the Certificates that it had purchased. *Id*. These claims "raise[d] a sufficiently similar set of concerns to permit [NECA] to purport to represent Certificate-holders from those Offerings." *Id.* at 163. The court emphasized that all of these claims turned on the same proof: whether or not Goldman's description of the lenders' underwriting processes "falsely" or "misleadingly" represented the individual lender's actual process. *Id.* at 163.

In *Retirement Board*, by contrast, the Second Circuit held that the plaintiff did not have class standing to bring breach of contract claims on behalf of investors in over five hundred trusts when the plaintiff had invested in only twenty-six of the trusts itself. *Retirement Board*, 775 F.3d at 162. The Second Circuit compared the plaintiffs' claims concerning the twenty-six trusts and the absent class members' claims concerning the remaining trusts. *Id.* It concluded that these claims did not "share the same set of concerns," because proving that the defendant had duty to act "require[d] examining its conduct with respect to each trust." *Id*. (noting that there was "no way in which answering these questions for the trusts in which Plaintiffs invested w[ould] answer the same questions for the numerous trusts in which they did not invest."). Unlike the claims in *NECA*, the court explained, Retirement Board's Complaint involved misconduct that "must be proved loan-by-loan and trust-by-trust." *Id.* at 155-57. The plaintiffs' claims were simply too distinct from those of the absent class-members to merit class standing.

Voya argues that the Plan's Separate Account stable value fund is distinct from its general account product because the separate account assets are insulated from any of Voya's other businesses, so that income and gains or losses are credited or charged directly to the Separate

14

Account.  Def.'s Surreply, 7.  "In the hypothetical general account product alleged in the Complaint," Voya explains, "the general account assets are commingled with the insurance company's own assets," which the company invests.  *Id*.  Ms. Dezelan responds that her claims concerning the separate and general account products implicate the same conduct.  Pl.'s Surreply, 4.  Both sets of claims allege that "by 'holding' assets in the general account —including assets allocated to separate account stable-value products — [Voya] can control the spread and directly control its own compensation."  *Id.* (citing Compl. ¶¶ 39-53).

The Court agrees with Voya.  Ms. Dezelan's claims concerning the general account products do not involve the "same set of concerns," *NECA*, 693 F.3d at 162, as her claims concerning Separate Account stable value funds.  To succeed on her Separate Account claims, Ms. Dezelan would have to show that Voya improperly transferred assets from the Separate Account to its general one, and thereafter pocketed some of the alleged "Spread."  For the general account claims, the "Spread" was allegedly in Voya's general account the entire time, meaning that Ms. Dezelan would not need to prove that Voya transferred the "Spread" to its own account.  Moreover, Voya asserts that the two types of products involve different contracts, and may have different Crediting Rate formulas.  As in *Retirement Board*, Ms. Dezelan seeks to assert, on behalf of absent class members, claims that are distinct and require different proof from those she brings on her own.

Significantly, the claims concerning Voya's Separate Account products may be more difficult to maintain, because they require the extra step of proving that Voya transferred Separate Account assets into its own account.  Furthermore, regardless of the difficulty of maintaining each claim, Ms. Dezelan does not have a concrete interest in bringing claims concerning Voya's general account products.  She did not own any of these products, and provides no information to suggest that the products were similar to the ones she actually did own, a factual allegation necessary for class standing.  Without additional allegations about the two Voya products in question, the Court cannot conclude that Ms. Dezelan "has a sufficiently personal and concrete stake in proving other, related

claims against the defendant." *NECA*, 693 F.3d at 164.  At this point, the Court cannot say that "the proof contemplated for all of [Ms. Dezelan's] claims [is] sufficiently similar," *NECA*, 693 F.3d at 164, to merit class standing under *NECA* and *Retirement Board*.

### 3.  Standing under *Fallick v. Nationwide*

Ms. Dezelan argues that she has standing to bring her ERISA claims under *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir.1998), which states that "an individual in one ERISA benefit plan can represent a class of participants in numerous plans other than h[er] own, if the gravamen of [her] challenge is to the general practices which affect all of the plans." Opp. Mem., 17 (citing *Fallick*, 162 F.3d at 422-23).  Ms. Dezelan also cites *Haddock v. Nationwide Fin. Servs., Inc.*, urging the court to reserve judgment on Ms. Dezelan's ability to bring general account claims until the class certification stage of this litigation.  *See* Opp. Mem., 18 (citing *Haddock*, 262 F.R.D. 97 (D. Conn. 2009), *vacated and remanded sub nom. Nationwide Life Ins. Co. v. Haddock*, 460 F. App'x 26 (2d Cir. 2012)).  Citing *Fallick*, the court in *Haddock* decided that once "individual standing [wa]s established" in a putative class action, it would evaluate the claims of putative class members using the requirements of Rule 23, rather than as part of the standing analysis.  *Id.* at 111 (citing *Fallick*, 162 F.3d at 423-22).

Neither the Sixth Circuit's decision in Fallick nor this Court's ruling in Haddock sufficiently support a ruling that class standing is appropriate here.  As an initial matter, the Court notes that courts in this Circuit have not universally adopted *Fallick*'s rule.  *See, e.g. In re Commodity Exch., Inc.*, --- F.Supp.3d ----, No. 14-MD-2548 (VEC), 2016 WL 5794776 (S.D.N.Y. Oct. 3, 2016) at *29 ("The 'juridicial link' doctrine has been adopted in various ways by other circuits, … but the Second Circuit has rejected this doctrine, stating that a plaintiff must demonstrate standing for each claim she seeks to press.") (internal citations omitted); *Gates*, 2012 WL 2953050, at *9 (dismissing case to the extent that plaintiff "purports to bring claims, class or otherwise, related to any UHG plan[] other than the one in which she participated," because "courts have repeatedly rejected plaintiff's proposed

reading of *Fallick*.").  In any event, both decisions predate this Circuit's rulings in *NECA* and *Retirement Board* and therefore cannot be used as binding precedent on the issue of class standing.

For the reasons discussed above, Ms. Dezelan does not have standing to bring her claims concerning the general account stable value funds.  Furthermore, she cannot bring her claims on behalf of purported class-members who invested in general account products.  Dismissal for lack of class standing is appropriate at the motion to dismiss stage.  *See Retirement Board*, 775 F.3d at 163 (affirming dismissal for lack of class standing at motion to dismiss stage); *Merryman v. J.P. Morgan Chase Bank, N.A.*, No. 15-CV-9188 (VEC), 2016 WL 5477776, at *14 (S.D.N.Y. Sept. 29, 2016) (dismissing for lack of class standing because the "plaintiffs have not explained how they have a personal and concrete stake in proving this case relative to ADRs that they do not own beyond the notion that introducing such evidence might augment the evidence supporting their own claims," and citing cases).  Ms. Dezelan's claims regarding Voya's general account products therefore will be dismissed.

### B.  Separate Account Products

Voya argues that Ms. Dezelan's claims concerning Voya's separate account stable value funds should be dismissed because they "rest on the incorrect assumption" that Voya set the Credited Rate at its own discretion and "retained" the spread produced by that rate.  Def.'s Mem., 15. Ms. Dezelan challenges this assertion by pointing to language in the Contract that gives Voya the power to set the Credited Rate and use "Separate Account assets for its own benefit."  Opp. Mem., 14.  The Court disagrees.  Even if the Court agreed with Ms. Dezelan's understanding of the Crediting Rate, she does not state a claim upon which relief can be granted.

Ms. Dezelan claims that Voya violated Section 404(a)(1) of ERISA, which requires a fiduciary's loyalty and prudence, *see* 29 U.S.C. § 1104(a) (describing the "prudent man standard of care"), as well as two subsections of Section 406. Specifically, she cites Section 406(a)(1)(C), which prohibits a fiduciary from causing "the plan to engage in a transaction [with] a party in interest," *id.*

at § 1106(a)(1)(C), and Section 406(b)(1), which prohibits a fiduciary from "deal[ing] with plan assets in his own interest or for his own account." *Id.* at § 1106(b)(1).

Under ERISA, a person is a fiduciary with respect to a plan to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation ... with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A); *see also Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993) (ERISA "provides that ... anyone ... who exercises discretionary control or authority over the plan's management, administration, or assets, is an ERISA fiduciary.") (citing 29 U.S.C. §§ 1102(a) and 1002(21)(A)).

A party's fiduciary status under ERISA "must be determined by focusing on the function performed, rather than on the title held." *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812–13 (2d Cir. 1987) (internal citations omitted). An entity must "exercise[] actual control over the disposition of plan assets," but "need not have absolute discretion with respect to a benefit plan in order to be considered a fiduciary." *Id.* (adding that "fiduciary status exists with respect to any activity enumerated in the statute over which the entity exercises discretion or control.").

When a party is responsible "for providing investment advice for a fee," the party has fiduciary status under ERISA. *Severstal Wheeling, Inc. Ret. Comm. v. WPN Corp.*, 119 F. Supp. 3d 240, 263 (S.D.N.Y. 2015), *aff'd sub nom. Severstal Wheeling, Inc. v. WPN Corp.,* 659 F. App'x 24 (2d Cir. 2016) (citing 29 U.S.C. § 1002(21)(A)(ii)). Courts have also found that an investment advisor owes fiduciary duties to an ERISA plan where the advisor provided regular, individualized investment advice that served as a "primary basis for investment decisions with respect to plan assets." *Id.* (citing *Goldenberg v. Indel, Inc*., 741 F.Supp.2d 618, 627 (D.N.J. 2010) (citing 29 C.F.R. § 2510.3–21(c)).

In any event, Voya does not argue that it is not a fiduciary in this context. Moreover, under the Contract, Voya was empowered to invest Separate Account assets in certain "investment vehicles," subject to the constraints set by the Contract. Contract, p. 24; *see also id.* at § 2.11 ("Amounts in a Separate Account are invested consistent with the investment objectives [Voya] set for that Separate Account."). In other words, the Complaint sufficiently states a claim that Voya had "discretionary control" over the plan's assets and is a fiduciary under ERISA. *See Mertens*, 508 U.S. at 251; *see also Blatt*, 812 F.2d at 812-13 (an entity must "exercise[] actual control over the disposition of plan assets," but "need not have absolute discretion with respect to a benefit plan in order to be considered a fiduciary."); Contract at § 7.07 ("[I]f the Plan is subject to [ERISA, Voya is] acting as a fiduciary, as defined in section 3(38) of ERISA, solely with respect to the management of Plan funds held in a Separate Account. … In all other respects, in exercising our rights, we represent ourselves and not the Plan.").

### 1. Breach of Fiduciary Duty Claim

ERISA provides that a fiduciary has the obligation to discharge its duties, including its investment decisions, "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose" of providing benefits to participants and their beneficiaries. 29 U.S.C. § 1104(a)(1). This duty is broad, and is informed by both the terms of ERISA and the common law of trusts. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 110-11 (1989). Indeed, ERISA's fiduciary obligations are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982), *cert. denied*, 459 U.S. 1069 (1982). ERISA requires a fiduciary's "complete loyalty," but fiduciaries "do not violate their duties [to a pension plan] by taking action which, after careful and impartial investigation, they reasonably conclude is best to promote the interests of participants and beneficiaries," even if the decision "incidentally benefits" the fiduciary. *Id.* at 271.

To state a claim for a violation of fiduciary duty under ERISA, a plaintiff must "plausibly allege[] that a prudent fiduciary in the same position could not have concluded that the alternative

action would do more harm than good." *Amgen Inc. v. Harris*, 136 S. Ct. 758, 760 (2016) (internal marks and citations omitted); *Bd. of Trustees of Operating Engineers Pension Trust v. JPMorgan Chase Bank, Nat. Ass'n*, No. 09-CIV-9333 KBF, 2013 WL 1234818, at *12 (S.D.N.Y. Mar. 27, 2013) (denying motion to dismiss ERISA duty of loyalty claim when plaintiff pled that the "defendant gambled that [an investment] would survive when it was the Plan's investment at risk [and when the Defendant] stood to … profit if the investment paid off"); *see also State St. Bank and Trust Co. v. Salovaara*, 326 F.3d 130, 136 (2d Cir.2003) ("This statutory duty of loyalty has been described by this Court as requiring that a fiduciary act, in Judge Friendly's felicitous phrase, with an 'eye single to the interests of the participants and beneficiaries.") (citing *Donovan*, 680 F.2d at 271)).

The Second Circuit has held that an ERISA complaint may rely on "circumstantial factual allegations to show a breach of fiduciary duties under ERISA," as long as the allegations give "rise to a 'reasonable inference' that the defendant committed the alleged misconduct." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (citing *Iqbal*, 556 U.S. at 678). "[C]ourts may draw a reasonable inference of liability when the facts alleged are suggestive of, rather than merely consistent with, a finding of misconduct." *Id.* (citing *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 121 (2d Cir.2013)).

Ms. Dezelan's claims concerning the Separate Account have two main components. First, she alleges that Voya manipulates the Crediting Rate to its own advantage. To support this claim, Ms. Dezelan alleges that between 2009 and 2014, Voya's Crediting Rate was generally several percentage points below the actual rate of return on the investments in the Separate Account, generating, in her estimation, tens of millions of dollars as "Spread."

Second, she alleges that Voya kept the "Spread" produced by the artificially low Crediting Rate, rather than using the Spread to stabilize the assets in the Separate Account. Ms. Dezelan alleges fewer facts to support this claim. She alleges that Voya "likely transfers" funds between the

Separate Account and its own general account at its sole discretion. Compl. ¶ 34. She argues that Connecticut law allows insurance companies to hold separate account assets in its general account. Opp. Mem., 13. (citing Regs. Conn. State Agencies § 38a-459-12(d)(6)(D)) (referring to "the manner in which account assets shall be allocated between the separate account, any supplemental account, and the general account"); *see also id.* at § 38a-459-16(a) ("An insurance company, at all times, shall hold sufficient assets in the general account, the separate account, or supplemental accounts, as appropriate, such that the value of the account assets, valued as if the assets were held in the insurance company's general account, equals or exceeds the reserve required for contracts supported by the separate account, determined as if the contracts were held in the general account."). At oral argument, however, she conceded that the Contract does not allow Voya to keep Separate Account assets, or take the Spread, before the Contract's termination.

Ms. Dezelan's Complaint does not plausibly allege that Voya keeps the Spread that it earns from the Plan's Separate Account assets in its own account. Even if the Court concluded that Voya artificially depresses the Crediting Rate and creates a "Spread," it cannot conclude, without more, that the Spread goes to Voya instead of remaining in the Separate Account. The allegations therefore do not give rise to a "reasonable inference of [Voya's] misconduct," *Pension Ben.*, 712 F.3d at 718, and the Court must grant Voya's motion to dismiss Ms. Dezelan's claim under Section 404(a) of ERISA.

### 2. Prohibited Transactions Claims

In addition to the general fiduciary duties of loyalty and prudence, ERISA also regards specific types of transactions between a plan and related persons, or "parties in interest," as inherently susceptible to abuse. These transactions are prohibited in Section 406 of ERISA. *See* 29 U.S.C. § 1106; *see also Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241 (2000) (citation omitted) (Congress "supplement[ed]" ERISA's general duty of loyalty by enacting 29 U.S.C. § 1106, which "categorically bar[s] certain transactions deemed likely to injure the pension

plan.").  The Second Circuit has held that courts should interpret Section 406 broadly in favor of plan beneficiaries and that a violation of this provision of ERISA may be demonstrated without a showing of bad faith or even in the presence of a reasonable transaction. *See Lowen v. Tower Asset Mgmt., Inc*., 829 F.2d 1209, 1213 (2d Cir.1987). It also places the "burden of proof … on the party to the self-dealing transaction to justify its fairness."  *Marshall v. Snyder*, 572 F.2d 894, 900 (2d Cir. 1978).

Ms. Dezelan invokes Section 406(a)(1)(C), which prohibits transactions with "part[ies] in interest to a plan," and Section 406(b)(1), which prohibits fiduciaries from "deal[ing] with plan assets in [their] own interest."  *See* 29 U.S.C. § 1106(a)-(b).

### a.  Section 406(a)(1)

To state a claim under Section 406(a)(1), plaintiff must allege that a fiduciary made an expenditure to a party in interest, which then shifts the burden to the fiduciary to show that the expenditure was reasonable.  *N.Y. State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*, 18 F.3d 179, 183 (2d Cir.1994)); *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).  Fiduciaries or other "person[s] providing services" to a benefit plan are considered parties in interest under Section 406(a).  29 U.S.C. § 1002(14)(A)-(B).

A claim under Section 406(a) therefore can survive a motion to dismiss, if it suggests that a fiduciary made payments or diverted funds to a party in interest.  In *Braden*, the Ninth Circuit found sufficient the plaintiff's allegation that the defendant received "revenue sharing payments [that] far exceeded the value of services actually performed" and "kickbacks" in exchange for investing in certain mutual funds.  *Braden*, 588 F.3d at 600; *see also Moreno v. Deutsche Bank Americas Holding Corp*., No. 15 CIV. 9936 (LGS), 2016 WL 5957307, at *7 (S.D.N.Y. Oct. 13, 2016) (denying motion to dismiss prohibited transaction claim based on allegations that defendant fiduciaries received inflated investment management fees).  In *Moreno*, the court declined to dismiss the plaintiff's claims under Section 406 because the plaintiff had alleged that the fiduciaries invested in Deutsche Bank's "proprietary index funds," which charged excessive fees.  The plaintiff specifically alleged

that the fiduciaries selected funds that "charged fees that were more than eleven times higher than a comparable Vanguard index fund," from which the fiduciaries—as subsidiaries of Deustche Bank—stood to benefit. *Id.* at *6; *see also Grodotzke v. Seaford Ave. Corp.*, 17 F. Supp. 3d 185, 194 (E.D.N.Y. 2014) (denying motion to dismiss claims under Sec. 406 when plaintiffs alleged that fiduciaries, who had complete control over the plaintiff's funds, "diverted [certain] proceeds and/or withheld plan assets for their own use."). In *Grodotzke*, the plaintiffs had alleged that fiduciaries "diverted" plaintiffs' assets "for their own personal use and benefit," by keeping money from construction projects that, under their contract with the plaintiffs, should have been forwarded to the plaintiffs. *Id.* at 193. The court reviewed allegations that the defendants used the diverted assets to pay creditors and buy property, and concluded that the plaintiffs had stated a claim for a violation of 29 U.S.C. § 1106(a) and (b). *Id.* at 194.

In contrast, Ms. Dezelan alleges that Voya "likely transfers funds between the [Separate Account] and [its general account]" at its sole discretion, but she does not allege that such a transfer occurred. Compl. ¶ 34. She notes that Connecticut law permits Voya to hold Separate Account assets in its own account and to retain the "Spread" if the contract is discontinued, but she has not alleged facts that suggest that Voya has abused its discretion by retaining any Plan assets. *See* Opp. Mem., 13 (citing Connecticut General Statutes § 38a-459-12(d)(6)(D)). Unlike the plaintiffs in *Grodotzke*, she does not allege a specific instance when Voya "diverted" Plan assets or used Plan assets "for [its] own personal use and benefit." *Grodotzke*, 17 F. Supp. 3d at 193. Rather, she alleges that Connecticut law gave Voya the discretion to keep the Spread, and that it "likely" does so. The Court cannot presume that Voya engaged in a prohibited transaction just because it had the ability to do so. Without more, Ms. Dezelan's claim under Section 406(a)(1) must be dismissed.

While ERISA's prohibited transaction provision is broad, and demands "complete loyalty" to Plan participants, *Donovan*, 680 F.2d at 271, the Complaint "must give rise to a reasonable inference

that the defendant committed the alleged misconduct." *Pension Benefit*, 712 F.3d at 718.  Ms. Dezelan's Complaint fails to meet this burden.

### b. Section 406(b)(1)

Section 406(b)(1) of ERISA prohibits fiduciaries from "deal[ing] with the assets of the plan in [their] own interest[s] or for [their] own account[s]." 29 U.S.C. § 1106(b)(1). The provision prohibits fiduciaries from "paying themselves from Fund assets." *Whitfield v. Tomasso*, 682 F. Supp. 1287, 1304 (E.D.N.Y. 1988); *LaScala v. Scrufari*, 330 F. Supp. 2d 236, 254 (W.D.N.Y. 2004), *as amended on reconsid.* (July 23, 2004) (noting that Section 406(b)(1) "suggests that a fiduciary, normally permitted to receive reasonable compensation for services rendered ... may not if self-dealing is involved in the transaction securing the payment").  Liability may be imposed under § 1106(b) "even where there is no taint of scandal, hint of self-dealing, [or] no trace of bad faith." *Lowen*, 829 F.2d at 1213 (internal citations omitted).

A court must, however, assess the Complaint to determine whether it states a claim upon which relief can be granted.  Ms. Dezelan argues that Voya violated Section 406(b)(1) by "compensating" itself by keeping the "Spread." *See* Compl. ¶¶ 86-87.  As explained above, Ms. Dezelan does not plausibly allege that Voya ever "kept" the Spread.  Her claim under Section 406(b)(1) therefore must be dismissed.

### F. Leave to Replead

Ms. Dezelan suggested at oral argument that she had prepared an amended complaint. Because repleading would not be "futile," *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000), the Court dismisses this case without prejudice to renewal.

## IV. Conclusion

For the reasons described above, Voya's Motion to Dismiss is GRANTED without prejudice to renewal.  Should Ms. Dezelan renew her Complaint, she must do so by **August 5, 2017**.

SO ORDERED at Bridgeport, Connecticut this 6th day of July, 2017.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE