UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DARLENE DEZELAN, individually, on behalf of the Cedars-Sinai Medical Center 403(b) Retirement Plan, and on behalf of all similarly situated Plans,<br><br>Plaintiff,<br><br>vs.<br><br>VOYA RETIREMENT INSURANCE AND ANNUITY COMPANY,<br><br>Defendant. | No. 3:16-cv-1251<br><br><br>**AMENDED COMPLAINT**<br><br><br>August 3, 2017 |

Plaintiff Darlene Dezelan, by her attorneys, individually, on behalf of the Cedars-Sinai Medical Center 403(b) Retirement Plan ("Plan') and all other similarly situated employee pension benefit plans covered under the Employee Retirement Income Security Act of 1974, as amended and the rules promulgated thereunder ("ERISA"), based on personal knowledge with respect to her own circumstances and based upon information and belief pursuant to the investigation of counsel as to all other allegations, alleges the following.

## I.    INTRODUCTION

1.      This is a class action against Voya Retirement Insurance and Annuity Company ("VRIAC" or "Defendant").

2.      VRIAC sells group annuity contracts to retirement plans. These contracts include what VRIAC labels and markets as Stable Value Funds ("SVAs"). The SVAs periodically credit a certain amount of interest income to retirement plans and the participants in such plans who invest their retirement plan accounts in SVAs. This income, generally expressed as a percentage of the invested capital, is determined pursuant to the Credited Rate. The Credited Rate varies in

that in each Crediting Period, VRIAC sets a Credited Rate for all money in and added to its

SVAs in that period.

   3.   VRIAC has substantial discretion to determine the Credited Rate for a given

Crediting Period. VRIAC sets the Credited Rate well below the internal rate of return ("IRR") on

the investments purchased with the Plan's deposits to the SVAs.  This difference between the

two rates (the "Spread") guarantees a substantial profit for VRIAC, which it is able to both retain

and use for its own purposes. VRIAC does not disclose the amount of Spread that it earns or that

it reasonably expects to receive to its retirement plan clients and their respective participants.

Thus, VRIAC collects hundreds of millions of dollars annually in undisclosed compensation

from the retirement plans and participants to whom it owes the highest duties known to law,

while preventing the Plans from determining the reasonableness of Defendant's compensation.

By engaging in this conduct, VRIAC violated ERISA in three ways:  first, VRIAC dealt with

plan assets for its own benefit in violation of ERISA § 406(b)(1); second, VRIAC breached its

fiduciary duties in violation of ERISA § 404, including, but not limited to, its duty of loyalty by

failing to discharges its duties solely in the interests of the participants; and, third, by earning

excessive, undisclosed compensation as a covered service provider in violation of ERISA §

406(a)(1)(C) and 29 C.F.R. § 2550.408b-2 ("Rule 408b-2").

## II.  JURISDICTION AND VENUE

   4.   This court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 because it is a civil action arising under the laws of the United States, and pursuant to

ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions

brought under Title I of ERISA.

   5.   This court has personal jurisdiction over Defendant because it is headquartered

and transacts business in and has significant contacts with this District, and because ERISA

provides for nationwide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). This

Court also has personal jurisdiction over Defendant pursuant to Fed. R Civ. P. 4(k)(1)(A)

because it would be subject to the jurisdiction of a court of general jurisdiction in Connecticut.

6.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C.

§ 1132(e)(2), because some or all of the violations of ERISA occurred in this District and

Defendant resides or may be found in this District. Venue is also proper in this District pursuant

to 28 U.S.C. § 1391 because Defendant resides and does business in this District, and a

substantial part of the events or omissions giving rise to the claims asserted herein occurred

within this District.

### III.  PARTIES

7.      Plaintiff is a resident of Los Angeles, California. Plaintiff is a participant in the

Plan. Plaintiff invests her retirement assets in Defendant's SVA through her Plan. All retirement

plans within the Class are herein referred to as the "Plans."

8.      VRIAC is a legal reserve insurance company authorized under the insurance laws

of New York. Its principal place of business is in Windsor, Connecticut.

### IV.  SUBSTANTIVE ALLEGATIONS

9.      Pursuant to its insurance business, Defendant offers and sells to retirement plans

Group Annuity Contracts ("GACs") which include SVAs managed through Defendant's general

investment account ("GIA") and guaranteed separate accounts ("GSA"). The Plan entered into a

GAC with Defendant. ("Agreement").

10.     The SVAs are offered to ERISA-covered retirement plans, including 401(k) and

403(b) plans.

11.     Defendant provides insurance and related services to the Plans under the GACs.

12.     Defendant provides the SVAs to the Plans as part of an integrated defined contribution plan contract under which a number of other critical investment, financial and recordkeeping services are provided by Defendant.

13.     The SVAs are intended to provide retirement investment income to plan participants through which participant assets grow through interest and additional contributions.

14.     Plaintiff invested in an SVA through her Plan. The Plan invested in a GSA product whose investments are accounted for by Separate Account 896 ("SA 896").

15.     The assets accounted by SA 896 "are invested consistent with the investment objectives" for the Separate Account.  Agreement § 2.11. The investment objectives for the Separate Account are "to outperform the Barclays Capital U.S. Aggregate Bond Index (n/k/a the Bloomberg Barclays Capital U.S. Aggregate Bond Index) by 50 basis points on a rolling 3-year basis." *Id.* at 19.

16.     The average duration of the Bloomberg Barclays Capital U.S. Aggregate Bond Index is 5.75 years.

  **A.     Defendant Is a Fiduciary**

  **1.     Defendant Is a Fiduciary in Management of Plan Assets Deposited in the GSA, Including Those Assets Transferred to the General Account**

17.     The GSAs such as SA 896 are insurance company separate accounts under 29 C.F.R. § 2510.3-101(h)(1)(iii), and the assets which the Plans deposit and Defendant holds in the account and income earned thereon are the Plans' assets under ERISA.

18.     A GSA like SA 896 is nothing more than an accounting entry in Defendant's general account books and records. It is not a separate legal entity such as a trust. It has no tax ID number, pays no taxes,  and files no tax returns  It is simply a "paper" account that is part of the

general account that is authorized under state insurance law. Legal title to the SA896 assets, or any other SA assets, is held by Defendant for the benefit of Plans and participants.

19.     The assets of the GSA should be reported to the United States Department of Labor ("DOL") as the Plans' assets on the Plans' annual report form, Form 5500.

20.     Participant allocations "booked" to the GSA are received by Defendant and deposited and physically held by Defendant with its other investment funds, where they are pooled and invested with the other insurance company general account investments. Defendant determines which investments and investment returns on those pooled investments are allocated to the "paper" bookkeeping accounts of the GSA.

21.     Defendant's discretionary handling and management of those GSA assets makes Defendant a fiduciary of the Plans with regard to those assets.

22.     Defendant has the right in its sole discretion to determine the GSA reserve levels.

23.     Section 38a-459-16 of the Connecticut General Statutes ("C.G.S.") provides the reserve requirements for separate accounts. The statute requires that an insurance company hold in its general account or some other account assets that are equal to the reserve requirement. C.G.S § 38a-459-16 (a). The reserve requirement is the amount contributed by a Plan and its participants, net of withdrawals, plus the amount of interest due under the Credited Rate, the "earnings attributable" to the contributions. C.G.S § 38a-459-16 (b). C.G.S § 38a-459-12 (d)(10). GSA earnings in excess of the reserve requirement do not have to be held in any particular account and are identical to and fungible with all other insurance company GIA assets and can be used for any corporate purpose.

24.     Defendant is required by law to calculate the cost of that risk that they will have to pay the guaranteed Credited Rate in future "loss" years in an actuarial memorandum. In an

actuarial memorandum filed with the Florida Office of Insurance Regulation concerning a Voya GSA product — that, similar to Plaintiff's SVA, provided for a 3% minimum Credited Rate plus an additional Credited Rate that was set for one-year — Defendant stated that the cost of the risk of future down years was a minimal 25 basis points ("bps"), a quarter of one percent. Accordingly, Defendant has determined that the cost of the risk of providing a stable Credited Rate and "smoothing" gains and losses with respect to a stable value product similar to Plaintiff's is approximately 25 bps.

25.     The GSA Plan assets, which Defendant holds in the GIA, retain their status as Plan assets.

26.     These GSA assets are pooled and invested by Defendant with Defendant's other financial assets. Spread above the reserve requirement, including earnings on the reserve, is no different from Spread earned on either a GIA SVA product or Defendant's other investment assets.

27.     Defendant, through the GIA, holds and invests Plan assets deposited to the GSA.

28.     The assets Defendant holds in the GIA which relate to the GSA are Plan assets under ERISA, and Defendant is a fiduciary to the Plans in its discretionary handling and management of those Plan assets.

## 2.     Defendant Is a Fiduciary in Setting Credited Rates

29.     Defendant, through its specialized professionals, developed the GAC terms through which the SVAs are provided to the Plans and their participants.

30.     Participant and Plan deposits to the SVAs accumulate interest at the "Credited Rate."

31.     The Credited Rate's purpose is to shields participants from short-term market interest rate swings by actuarially amortizing gains and losses over the duration of the underlying fixed income portfolio, in this case, 5.75 years, while ensuring that the participants still receive the total investment performance of the underlying portfolio. The SVAs are therefore "smoothing" products in that they "smooth" gains and losses over the duration of the portfolio yet match the returns on the portfolio over the portfolio's duration. Accordingly, by the end of any given  maturity period, the book value and market value of the portfolio should be the same. All portfolio gains should ultimately be paid to participants through the Credited Rate (*see* Lemke and Lins, *ERISA for Money Managers and Advisors* § 2.143) while the Defendant is protected from any losses from its guarantees through that period by the Credited Rate, risk charge, and related reserve.

32.     As alleged below, Defendant sets the Gross Credited Rate (before the deduction of expenses) in its sole discretion, subject only to a minimum guaranteed Credited Rate, which can be as low as 1%. Plaintiff's SVA provides for a minimum Credited Rate of 3%. Thus, Defendant, by having or exercising such discretionary authority or control, is an ERISA fiduciary in connection with the setting of the Credited Rate.

33.     The Credited Rate applies to SVA assets until it is reset at the beginning of the next Crediting Period. The Crediting Period for the Plan's SVA is one-year. Defendant sets and resets the Gross Credited Rate for the other SVAs as frequently as quarterly.

34.     Defendant, like other long-operating, successful insurance companies calculates, for both business and regulatory purposes, the current cost of providing a stable Credited Rate and the attendant risk that the value of underlying assets may fluctuate over time, through their extensive use of actuarial science, advanced mathematics, sophisticated hedging techniques, high

level quantitative research, and long term historical investment performance expertise. Indeed, insurance companies are in the business of pricing their risk of loss arising from managing the risk of fluctuations in the value of assets underlying an SVA, and they profitably operate that business based on those calculations. Identifying, calculating, and managing risk for profit is the business of insurance companies and, in particular, that of the Defendant.

35.     Moreover, this combination of skills is so unique that certain insurance companies, like Defendant, can sell their ability to accurately price this risk to less sophisticated third party financial institutions by "wrapping" those firms' stable value investment funds with Defendant's guarantee against losses from investment volatility. The "wrap" contract permits those institutions to offer a stable Credited Rate that shields participants from short-term market swings while generally guaranteeing withdrawals from those funds at book value. The general cost of a stable value "wrap" contract is only 20 to 25 bps. (*See* http://www.pionline.com/article/20140428/PRINT/304289980/wrap-availability-puts-stable-value-back-on-map.) This cost of providing a wrap contract to "smooth" out gains and losses on the underlying portfolio is materially identical to the 25 bps actuarial cost of smoothing gains and losses on the underlying GSA portfolio as alleged above.

36.     The Agreement grants VRIAC absolute discretion to set the Credited Rate, stating: "The Credited Rate is determined by [VRIAC]." Agreement § 2.08. Defendant can change the Credited Rate on thirty-days' notice. *Id*. § 2.07. "The formula [VRIAC] ***currently*** use[s] to determine this contract's Credited Rate is described in the attached Credited Rate Determination Exhibit." *Id*. at 2.08 (emphasis added). However, there is no express language in the Agreement requiring VRIAC to use this formula. The formula has three principal components which Defendant sets in its discretion: (i) the "net effective yield available" . . . "on

8

assets similar to those in the Separate Account;" (ii) the projected Separate Account Balance, which reflects the projected market value of assets in the Separate Account; and (iii) the projected Interest Accumulation Fund balance, which reflects the projected book value of contributions to and withdrawals from the SVA by the Plan. Agreement at 22.

37.     Defendant should set and reset the Credited Rate at a level that is designed to ensure tracking with its returns on invested assets in SA 896 over the maturity period. Accordingly, assuming SA 896 was invested as represented, the Credited Rate formula should be based on the "net effective yield" on the Barclays Capital U.S. Aggregate Bond Index plus 50 basis points. If the Credited Rate is set in this way, Plans and Participants bear substantially all of the investment risk of the products, since the amount of their returns will fluctuate with the performance of the index.

38.     Defendant's cost of the risk related to SVA guarantees (*i.e.*, the 25 bps actuarial cost) is ***not*** a component of the Credited Rate formula provided in the Agreement and should not be considered in setting the Credited Rate.

39.     The Credited Rate formula does not include a component for any fees, profit, or compensation for Defendant, and Defendant is not entitled to take any Spread from the SVAs. Defendant is paid a fee of 75 bps for offering and managing the GSA; other than this fee, which is transparent and negotiated at the outset of the contract, ***all*** income from the from SA 896 should be paid to participants through the Credited Rate.

40.     Defendant effectively prevents a Plan from terminating a SVA in the event Defendant exercises its discretion to impose an unfavorable Credited Rate by imposing numerous restrictions. Accordingly, Defendant has, under the GACs, substantial authority to protect its own interests at the expense of the Plans.

41. For example, Defendant has the right to delay payments from the GACs or transfers to another investment if it determines, in its sole discretion, that a withdrawal may have an adverse impact on Defendant or its accounts.

42. For example, any transfer from the SVAs to a competing investment option must be invested in a non-competing option for a minimum period of time such as, in the Plan's case, ninety days, or may be subject to substantial financial penalties. Defendant determines in its sole discretion the competing options which include any option that may be invested in assets other than common or preferred stock, such as any money market or bond fund and certain asset allocation or lifestyle funds. Through this restriction, Defendant forces participants who want to transfer out of the SVAs to invest in the most low-risk, stable value, portions of their retirement savings in much higher risk equity investments. Defendant has the right to impose these restrictions in its sole discretion, when it is economically advantageous to Defendant. Agreement §§ 1.09, 2.16.

43. Additionally, Defendant has the right to determine the manner in which Plans may withdraw from the SVAs, and exercises that authority to impose substantial penalties upon participants if an employer terminates a GAC (and, therefore, terminates the SVA which is incorporated into the GAC), which include requiring that participants' retirement assets be paid out over a protracted period of as long as ten years, and a punitive withdrawal penalty which is not related to a true economic market value of the termination but instead is designed to force the employer not to terminate the GAC. Agreement at 25-26.

44. Upon information and belief, Defendant does not provide reasonable notice of the change in the Credited Rate. As alleged above, a Plan cannot reasonably terminate and replace a SVA without also terminating and replacing the GAC as a whole, including all of the critical

financial, investment and recordkeeping services necessary to operate a Plan. A wholesale change in all material operations of a Plan such as this requires substantial time as the Plan must fulfill numerous fiduciary, legal and administrative obligations related to those efforts, including hiring a new Plan provider and making the transition away from Defendant. These actions cannot be accomplished in the time between the announcement and imposition of a new unfavorable Credited Rate. Thus, Plan fiduciaries are effectively precluded from making determinations concerning the reasonableness of the Credited Rate, and from replacing the GAC with another stable value fund when a Credited Rate imposed by Defendant is unreasonable.

45.     Defendant has substantial discretion in the setting of the Credited Rate above the guaranteed amount. Accordingly, Defendant, through its management, investment managers and Board of Directors, has the complete and unfettered discretion to determine the Credited Rates and, therefore, the earnings that are paid out on the SVAs.

46.     Defendant sets its own compensation by using its unfettered discretion to decide the Credited Rate because it collects the difference between the Credited Rate and the IRR – *i.e.*, the Spread.

47.     The restrictions and penalties alleged above cause the Plans to be locked into disadvantageous Credited Rates and GACs. In locking the Plans into the SVAs, over which Defendant retains the authority to establish the Credited Rates, Defendant acts as a fiduciary in the setting of the SVA Credited Rate.

> **3.     Defendant Exercised Fiduciary Authority to Breach the GAC Terms to Set an Artificially Low Credited Rate and Take Spread in Violation of ERISA**

48.     The GACs are the Plans' assets, and the assets held under the SVAs in the are the Plans' assets as well.

49.     Defendant is a fiduciary concerning the GACs and management of the Plan's assets held under the GACs.

50.     Plan fiduciaries may not set their own compensation under ERISA.

51.     Defendant imposes charges that are directly deducted from the SVAs, which sharply reduces the Gross Credited Rate to a Net Credited Rate.

52.     For the GSAs, fees are determined pursuant to the Agreement. Agreement at 24. The sole fee Defendant is entitled to take under the GSA SVAs is 75 basis points.  This fee is to cover all expenses and compensation associated with the SVA, including administrative expenses, profit and the costs of providing a stable interest rate.

53.     Defendant, through its management and Board of Directors, has substantial discretion to invest the assets and, therefore, it controls the amount it earns on the assets the Plans invest in the GSAs and GIA ("Investment Income").

54.     For the GSA, Investment Income includes the difference between the actual GSA earnings on investments made by Defendant and the Credited Rate paid to participants for that Crediting Period, the Spread. Under the GAC, Defendant is not entitled to take any Spread Investment Income. All Spread Investment Income should be paid to the Plans and participants through the Credited Rate.

55.     In violation of the Agreement, Defendant has set an artificially low Credited Rate which has denied Plans and participants Spread Investment Income to which they are entitled.

56.     The Plan's auditor computed the earnings on Plan assets held in the GSA from 2009 to 2014. During this six-year period, SA 896 earned average Spread of 190 bps above the Credited Rate. After deducting the 75 bps annual fee, SA 896 earned an average annual net Spread of 115 bps. Accordingly, in addition to the $12,403,604 in fees the Plan agreed to pay

Defendant, SA 896 earned an additional $14,613,885 in unauthorized Spread compensation from the Plans' deposits to the SVA, an additional 117 %.

| Year | Earned | Credited | Spread (%) | Fee (%) | Balance of SA 896 (as of 12/31) | Spread ($) | Fee ($) | Spread minus Fee |
|------|--------|----------|------------|---------|----------------------------------|------------|---------|------------------|
| 2009 | 9.3% | 4.5% | 4.8% | 0.75% | $200,037,603 | $9,601,805 | $1,500,282 | $8,101,523 |
| 2010 | 7.5% | 4.1% | 3.4% | 0.75% | $234,416,256 | $7,970,153 | $1,758,122 | $6,212,031 |
| 2011 | 7.0% | 3.8% | 3.2% | 0.75% | $275,539,892 | $8,817,277 | $2,066,549 | $6,750,727 |
| 2012 | 5.0% | 3.4% | 1.6% | 0.75% | $305,361,562 | $4,885,785 | $2,290,212 | $2,595,573 |
| 2013 | -1.7% | 3.1% | -4.8% | 0.75% | $308,602,524 | ($14,812,921) | $2,314,519 | ($17,127,440) |
| 2014 | 6.1% | 2.9% | 3.2% | 0.75% | $329,855,967 | $10,555,391 | $2,473,920 | $8,081,471 |
| 2009 through 2014 | | | | | | **$27,017,489** | **$12,403,604** | **$14,613,885** |

57.     In addition to earning a net average Spread of 117% over Defendant's fees over these six years, SA 896 earned a substantially higher Spread in five of the six years.

58.     Since the average duration (representing the maturity period) of the underlying portfolio is 5.75 years, all SA 896 gains and losses should have been amortized and passed through to Plan participants through the Credited Rate within 5.75 years. For example, SA 896 earned a whopping 4.8% in Spread, net of fees, in 2009. But, by 2014, longer than the SA 896 duration, none of that amount had been paid back to Participants through the Credited Rate. To the contrary, the Spread continued to grow.

59.     In setting such excessive Spread, Defendant did not amortize Spread Investment Income through the Credited Rate as required. Given the existence of the magnitude of the Spread Defendant set over six years, Defendant set an artificially low Credited Rate, thereby depriving Plaintiff and class members substantial interest income in excess of 1% per year.

60.     The extra Spread Defendant earned in SA 896 is substantially in excess of the amount required to be reserved under Connecticut law. As alleged above, this amount is held in

and fungible with Defendant's other general account assets and used for general corporate purposes.

61.     Defendant has earned substantial additional Spread Investment Income by virtue of setting an artificially low Credited Rate and taking Spread.

62.     Since the assets in the GSA are Plan assets, and earnings on the investment of Plan assets, including the Spread, are Plan assets, in taking Spread income, Defendant has wrongfully taken Plan assets. Moreover, Defendant has exercised discretion to violate the Agreement and take Spread income for its own purposes.

63.     In addition to all of the expenses it was paid as alleged above, Defendant had complete discretionary control to take and in fact took substantial GSA Spread in violation of the Agreement.

64.     For the GSA, Defendant earned direct and indirect compensation from the Spread income earned from Plan deposits to the SVAs.

65.     The discretionary retention and use of undisclosed, unauthorized and excessive GSA Spread compensation within the GSA results in Defendant, itself and through its affiliates, having discretionary authority over the level of compensation it receives from the GSA.

66.     Because Defendant in its sole fiduciary discretion set the SVA Credited Rates, and because the Spread income is profit to Defendant, in exercising its fiduciary discretion to set the income, Defendant exercised fiduciary discretion to set its own fees, profits, and compensation related to the Plans' deposits into the SVAs.

67.     Defendant does not disclose to Plan participants or fiduciaries the Spread income compensation it pays itself, which reduces the investment returns on Plan assets. Defendant's

non-disclosure of the amount of the Spread income gave it a competitive advantage over other Plan service providers who disclosed all of their fees.

**B.      Defendant Is a Party in Interest Receiving Undisclosed, Unreasonable Compensation Prohibited by ERISA**

68.      Defendant is a party in interest to the Plans, and any compensation it receives from the Plans in connection with services provided to the Plans is prohibited by ERISA unless it is reasonable.

69.      For GACs in effect as of and after July 1, 2012, Defendant is a "covered service provider" under Rule 408b-2(c)(1)(iii)(C) because it provides, among other services, insurance and recordkeeping services to the Plans through the GACs, including its insurance guarantees of principal of the SVAs through the GACs.

70.      In connection with its insurance and recordkeeping services, Defendant reasonably expects to receive and, in fact, receives direct and/or indirect compensation in connection with receipt of the plan deposits to the SVAs for which insurance and recordkeeping services are provided.

71.      Defendant is also a "covered service provider" under Rule 408b-2(c)(1)(iii)(A) because it provides fiduciary services to the Plans by virtue of managing SVA assets through the GSAs, and reasonably expects to receive and receives direct and/or indirect compensation in connection with its investment of the plan deposits, which are Plan assets, to the SVAs, for which fiduciary services are provided.

72.      Defendant earns for itself and its affiliates income from the Plan's assets which is intended to cover investment management and administrative expenses, expenses for risk and substantial profit.

73.     This income constitutes direct and indirect compensation as defined in Rule 408b-2(c)(1)(viii)(B)(1) and (2) in connection to Defendant's fiduciary, insurance and recordkeeping services provided under the GACs.

74.     In order to provide services to a plan, the services must be necessary, the contract or arrangement must be reasonable, and the compensation must be reasonable. A contract or arrangement with a plan is not reasonable unless compensation is disclosed prior to entering into the contract for services.

75.     In order for the arrangement to be reasonable, Defendant was required to disclose to each Plan's "responsible plan fiduciary" the amount of the income on the later of July 1, 2012, or the date the Plan purchased the GAC. For GACs in effect prior to July 1, 2012, Defendant was required to disclose the compensation it received in connection with the services provided to the Plans under the DOL regulations then in effect.

76.     Defendant failed to adequately disclose to the Plans its income, and its receipt was therefore prohibited by ERISA as *per* se unreasonable.

77.     Moreover, even if Defendant had disclosed such compensation (and it did not), its receipt of such compensation is still impermissible under ERISA because the compensation for such services is excessive and unreasonable.

## V.   CLASS ACTION ALLEGATIONS

78.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and a class defined as follows (the "Class"):

> All ERISA covered employee pension benefit plans whose plan assets were invested in Voya Retirement Insurance and Annuity Company's Group Annuity Contract Stable Value Funds within the six years prior to, on or after July 26, 2010.

79.     The members of the Class are so numerous that joinder of all members is impractical. Upon information and belief, the Class includes hundreds of retirement plans.

80.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims, and the claims of all Class members, arise out of the same conduct, policies and practices of Defendant as alleged herein, and all members of the Class are similarly affected by Defendant's wrongful conduct.

81.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

      a.     Whether Defendant is a fiduciary of the Plans;

      b.     Whether Defendant is a party in interest with respect to the Plans;

      c.     Whether Defendant breached its fiduciary duties in failing to comply with ERISA as set forth above;

      d.     Whether Defendant's acts as alleged above breached ERISA's prohibited transaction rules;

      e.     Whether monies received and retained by Defendant were Plan assets;

      f.     Whether an affirmative defense to a prohibited transaction claim applies and can be satisfied by Defendant; and

      g.     Whether Defendant's acts proximately caused losses to the Plans and, if so, the appropriate relief to which Plaintiff, on behalf of the Plan and the Class, is entitled.

82.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

83.    Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

84.    In the alternative, certification under Rule 23(b)(2) is warranted because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

85.    In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VI.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**ERISA § 502(a)(2), (3) [29 U.S.C. § 1132(a)(2), (3)] for Violations of
ERISA § 406(a)(1)(C) [29 U.S.C. § 1106(a)(1)(C)] and Rule 408b-2**

86.    Plaintiff re-alleges and incorporates herein by reference all prior allegations of the Complaint.

87.    ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), provides that a fiduciary shall not cause a plan to engage in a transaction if it knows that the transaction constitutes the payment of direct or indirect compensation in the furnishing of services by a party in interest to a plan.

88.     Defendant is a party in interest under ERISA in that it provided services to each of the Plans. ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

89.     As alleged above, Defendant is also a covered service provider.

90.     Defendant received compensation in the form of income and a specific expense charge in exchange for the services it provided to the Plans pursuant to the GACs and, therefore, the GACs violate this section of ERISA.

91.     The only exception to the prohibition of such compensation is if it was for services necessary for the operation of a plan and such arrangement and compensation were reasonable. ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2). Additionally, transactions after June 30, 2012 must meet the specific requirements of Rule 408b-2.

92.     The compensation paid to Defendant was unreasonable and impermissible under ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2), for the following reasons.

93.     First, as alleged above, Defendant failed to make disclosures concerning such income compensation.

94.     As a result of Defendant's failure to make such disclosures, the contract or arrangement is unreasonable within the meaning of ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

95.     Second, the income and expense compensation was excessive and unreasonable as a matter of fact in relation to the value of the services provided with regard to the SVAs in that the Spread exceeded the agreed expenses.

96.     When compared to the expenses related to competing funds, the total compensation for the SVAs was excessive.

97.     Plaintiff and the Class have been damaged in the amount of the income Defendant took in connection with the SVAs.

19

98.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409.

99.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

100.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) [ ] enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

101.     Plaintiff and the Class are entitled to recover the income and other appropriate relief as a result of these violations. Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief to Plaintiff and the Class, including but not limited to the disgorgement by Defendant of its undisclosed, excessive, and unreasonable compensation and surcharge.

## SECOND CLAIM FOR RELIEF
### ERISA § 502(a)(2), (3) [29 U.S.C. § 1132(a)(2), (3)] for Violations of ERISA § 406(b)(1) [29 U.S.C. § 1106(b)(1)]

102.     Plaintiff re-alleges and incorporates herein by reference all prior allegations of the

Complaint.

103.    ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), provides that a fiduciary shall not deal with plan assets in his own interest or for his own account.

104.    In setting and resetting the Credited Rates applicable to the SVAs and setting the amount of and keeping the income, and in determining the level of its own compensation, Defendant deals with plan assets in its own interest or for its own account.

105.    Plaintiff and the Class have been damaged in the amount of the income Defendant took in connection with the SVAs.

106.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409.

107.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

108.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) [ ] enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

109.    Plaintiff and the Class are entitled to recover the income and other appropriate relief as a result of these violations. Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the

Court should award equitable relief to Plaintiff and the Class, including but not limited to the disgorgement by Defendant of its undisclosed, excessive, and unreasonable compensation and surcharge.

### THIRD CLAIM FOR RELIEF
### ERISA § 502(a)(2), (3) [29 U.S.C. § 1132(a)(2), (3)] for Violations of ERISA § 404 [29 U.S.C. § 1104]

110.     Plaintiff re-alleges and incorporates herein by reference all prior allegations of the Complaint.

111.     In setting and resetting the Credited Rates applicable to the SVAs, and setting the amount of and keeping the income, and in determining its own compensation, Defendant has breached its fiduciary duties to the Plans and their participants.

112.     Plaintiff and the Class have been damaged in the amount of the income Defendant took in connection with the SVAs.

113.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan, and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

114.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409.

115.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or

duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

116.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) [ ] enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

117.     Plaintiff and the Class are entitled to recover the income and other appropriate relief as a result of these violations. Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief to Plaintiff and the Class, including but not limited to the disgorgement by Defendant of its undisclosed, excessive, and unreasonable compensation and surcharge.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendant on all claims and requests that the Court award the following relief:

A.     Certify this action as a class action pursuant to Fed. R. Civ. P. 23;

B.     Order declaratory and injunctive relief as necessary and appropriate, including enjoining Defendant from further violating the duties, responsibilities, and obligations imposed on it by ERISA, with respect to the Plans;

C.     Award, declare or otherwise provide Plaintiff and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper

and such appropriate equitable relief as the Court may order, including damages, an accounting, surcharge, disgorgement of profits, equitable lien, constructive trust, or other remedies;

      D.    Award to Plaintiff attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

      E.    Award pre-judgment and post-judgment interest.

Dated: August 3, 2017             Respectfully submitted,

                              *s/ Robert A. Izard*

Robert A. Izard (ct01601)
Mark P. Kindall (ct13797)
Christopher M. Barrett (ct30151)
IZARD, KINDALL & RAABE, LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile: (860) 493-6290
rizard@ikrlaw.com
mkindall@ikrlaw.com
cbarrett@ikrlaw.com


Gregory Y. Porter, *pro hac vice* to be filed
Ryan T. Jenny, *pro hac vice* to be filed
Michael L. Murphy, *pro hac vice* to be filed
BAILEY & GLASSER LLP
1054 31st Street, NW
Suite 230
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
gporter@baileyglasser.com
rjenny@baileyglasser.com
mmurphy@baileyglasser.com

***Attorneys for Plaintiff***

CERTIFICATE OF SERVICE

I, Robert A. Izard, certify that, on August 3, 2017, I caused a true and correct copy of the foregoing document to be served electronically on all counsel of record registered for electronic service for this case.

Executed this 3rd day of August 2017 at West Hartford, Connecticut.

*s/ Robert A. Izard*

Robert A. Izard (ct01601)
IZARD, KINDALL & RAABE, LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile: (860) 493-6290
rizard@ikrlaw.com