UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DARLENE DEZELAN, individually, on
behalf of the Cedars-Sinai Medical Center
403(b) Retirement Plan, and on behalf of all
similarly situated Plans,
    *Plaintiff*,

v.

VOYA RETIREMENT INSURANCE AND
ANNUITY COMPANY,
    *Defendants*.

No. 3:16-cv-01251 (VAB)

**RULING ON MOTION TO DISMISS AMENDED COMPLAINT**

Darlene Dezelan ("Plaintiff") brings this class action against Voya Retirement Insurance and Annuity Company ("Voya" or "Defendant"), concerning retirement funds managed by Voya on her behalf. She brings three claims under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, on behalf of the Cedar-Sinai Medical Center 403(b) Retirement Plan, in which she was a participant, as well as all other ERISA-covered employee pension benefits plans whose assets were invested in similar funds managed by Voya.

This Court previously dismissed Ms. Dezelan's Complaint without prejudice. Following the dismissal, she filed an Amended Complaint, ECF No. 42, which Voya now moves to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

For the following reasons, Voya's motion to dismiss, ECF No. 45, is **GRANTED**.[1] The case is **DISMISSED** with prejudice.

---

[1] Ordinarily, it is this Court's practice to schedule oral argument on dispositive motions, especially where a party expressly requests it, as Ms. Dezelan has done here. In this case, however, the issues raised are so similar to matters previously (and extensively) briefed and argued that this matter will be decided based on the parties' well-drafted written submissions

1

I.  **FACTUAL AND PROCEDURAL BACKGROUND**

Ms. Dezelan, a resident of Los Angeles, California, has retirement assets in the Cedars-Sinai Medical Center 403(b) Retirement Plan (the "Plan"), a Group Annuity Contract (the "Contract") sold by Voya. Am. Compl. ¶¶ 7, 14, ECF No. 42. Voya, a legal reserve insurance company authorized under the insurance laws of New York and based principally in Windsor, Connecticut, offers and sells Group Annuity Contracts to retirement plans, *id.* ¶ 8, and provides its retirement plan clients an opportunity to invest into a stable value fund, including the Plan and Contract at issue in this case. *Id.* ¶ 2.

A.  **Factual Allegations**

Given the Court's ruling on the initial Complaint, the Court assumes the parties' familiarity with the relevant factual allegations. The Court therefore restates the allegations only to the extent necessary to address the new issues raised in the Amended Complaint.

1.  **The Contract**

The Amended Complaint focuses on Ms. Dezelan's investment in a stable value fund through the Plan, a guaranteed separate account known as Separate Account 896 (the "Separate Account"). *Id.* ¶ 14. A "separate account" stable value fund uses "a separate account established by [the] bank or insurance company for the sole purpose of holding the invested assets." Thomas P. Lemke & Gerald T. Lins, *ERISA for Money Management and Advisors* § 2:143 (2016 Ed.) ("In addition to increased flexibility and transparency, the separate account also provides an

---

alone. *See* D. Conn. L. R. 7(a)(3) ("Notwithstanding that a request for oral argument has been made, the Court may, in its discretion, rule on any motion without oral argument."). Indeed, after much consideration, the analysis undertaken by the Court below largely mirrors the analysis undertaken by it previously in *Dezelan v. Voya Retirement Insurance and Annuity Co.*, No. 3:16-cv-1251, 2017 WL 2909714, (D. Conn. July 7, 2017).

additional level of comfort because the underlying assets are segregated from those of the bank or insurance company.").

The Contract clarifies that the Separate Account is a "segregated asset account [that Voya] established under Connecticut law." Contract § 1.21, Def.'s Mot. to Dismiss Am. Compl., ECF No. 45-3 ("Deposits to this contract are allocated to a Separate Account"). Under the Contract, the assets in the Separate Account "are not chargeable with liabilities arising out of any of [Voya's] other business," but are owned by Voya. *Id.* § 2.14 ("[Voya] own[s] the investments held in a Separate Account" and "is not a trustee of such assets.").

The Separate Account is an "individual separate account that invests in broad sectors" that aims to "outperform the Barclays Capital U.S. Aggregate Bond Index by 50 basis points on a rolling 3-year basis."[2] Contract at 19. Under the Contract, the Plan's participants can convert their accumulated contributions and interest into annuities. *Id.* § 5.01; *id.* § 1.05 (allowing for "(a) Participant-invested withdrawals; (b) Participant-directed transfers of their account balances between Investment Options; (c) Participant loans; or (d) Annuity purchases").

Under the Contract, the Plan deposits funds to Voya, which are then "allocated to the Separate Account" consistent with the "investment objectives [Voya] has set for that Separate Account" *Id.* §§ 2.01, 2.02, 2.11. When the assets in the Separate Account accumulate interest, Voya "credits" a certain portion of that interest to the Interest Accumulation Fund at the "Credited Rate." *Id.* § 2.07. Although "[t]he Credited Rate is determined by [Voya,]" the Contract guarantees that "the minimum guaranteed Credited Rate, net of any applicable expense

---

[2] When Voya moved to dismiss Ms. Dezelan's Amended Complaint, Voya attached the Stabilizer Group Annuity Contract ("Contract") between Voya, as successor in interest to ING National Trust, and the Cedars-Sinai Plan, effective July 11, 2007, and renewed in 2014. *See* Contract; Hill Decl. Ex. 1, ECF No. 45-2.

3

charges assessed, is 3.0%." *Id.* § 2.08. From April 1, 2014, through June 30, 2014, Voya credited 3.0% to the Interest Accumulation Fund. *Id.* at 28. Under the Contract, Voya also charges a "Guaranteed Contract Fee" of 0.75%, which is deducted from the Credited Rate of the Interest Accumulation Fund. *Id.* at 24; *see also id.* § 1.22 ("[Voya's] financial obligations to [the participants] are measured by the Interest Accumulation Fund.").

The Contract states that "benefit withdrawals," *id.* § 2.16, including annuity purchases, "may not exceed the balance in the Interest Accumulation Fund." *Id.* § 2.21. Similarly, Employer-Event Withdrawals, which are "Participant-initiated withdrawals or transfers from the Interest Accumulation Fund" and a result from "events not in the ordinary course of business" such as, "spin offs," "sales," "mergers," or "layoffs," *id.* § 1.14, are paid from "[t]he Separate Account, to the extent of available funds." *Id.* § 2.26; *id.* § 1.1.4.

If Cedar-Sinai discontinues its contract with Voya, the Plan can only receive the amount of money in the Interest Accumulation Fund. *Id.* at 25; *see also*, *id.* § 3.06 ("We will retain any amounts remaining under the Separate Account Balance following payment of the Interest Accumulation Fund[.]").

In the Contract, Voya "acknowledges that, [if] the Plan is subject to . . . ERISA, we are acting as a fiduciary, as defined in section 3(38) of ERISA solely with respect to the management of Plan funds held in Separate Account." *Id.* § 7.12. The Contract also adds, "[i]n all other respects, in exercising our rights, [Voya] represents ourselves and not the Plan." *Id.*

The Contract provides a formula to determine the Credited Rate for each period. Contract at 22–23.[3] The Credited Rate formula includes "[t]he projected balance of the Interest

---

[3] The formula is provided in an Exhibit to the Contract, rather than the Contract itself. Section 2.08 of the 2014 Contract states that "[t]he Credited Rate is determined by us . . . . The formula

4

Accumulation Fund[,]" Contract at 22; *see also, e.g.*, *id.* § 1.16, and "[t]he projected Separate Account Balance on the date the new Credited Rate is first effective," which is reflected as "MV." Contract at 22; *see also id.* § 1.21. The Credited Rate formula also considers "[t]he net effective yield available, on the date we determine the new Credited Rate, on assets similar to those in the Separate Account." Contract at 22. "Any projections [Voya makes] are based on current balances or values available on the date [Voya] determines the new Credited Rate, and reasonable assumptions as to cash flow, earnings, and other occurrences between that date and the date of the new Credited Rate[.]" *Id.* at 23.

The Contract gives Voya the ability to change the Credited Rate formula. Contract § 2.08. The Contract, however, only describes one formula it "currently uses[s]." *Id.* ("The Credited Rate is determined by us. It reflects our assumptions . . . . The formula we currently use to determine the Credited Rate is described in the attached Credited Rate Determination Exhibit."). Before Voya may change the formula, it must provide a thirty-day advance written notice to participants. *Id.* at 23. Voya may not change the formula, however, if a participant submits a discontinuation notice before the change is implemented. *Id.*

### i. Ms. Dezelan's Allegations

Ms. Dezelan alleges that Voya earns undisclosed profits from the Separate Account profits by depressing the Credited Rate below the Internal Rate of Return, so the value of the Interest Accumulation Fund, and therefore the money available to the participants, is artificially low. Am. Compl. ¶ 3. She claims that Voya collects "a substantial profit" from the difference between the guaranteed Credited Rate and the Internal Rate of Return, which she calls the

---

we currently use is described in the attached Credited Rate Determination Exhibit." Contract § 2.08.

"Spread." *Id.* By lowering the Credited Rate below the guaranteed rate of 3%, Ms. Dezelan contends that Voya is able to "collect[] hundreds of millions of dollars annually from undisclosed compensation from the retirement plans and the participants[.]" *Id.*

Ms. Dezelan's allegations focus on the Credited Rate of the Separate Account between 2009 and 2015, which she calls the maturity period of the underlying portfolio. *Id.* ¶ 58; *see also id.* ¶¶ 31, 37. She alleges that Voya breached its fiduciary duties to the Plan during this period, by reducing the amount of the Plan's funds that eventually would be available for her to withdraw. *Id.* ¶ 55.

Ms. Dezelan alleges that Voya "has substantial discretion to invest the assets and, therefore, [Voya] controls the amount it earns on the assets the Plan invests[.]" *Id.* ¶ 53; *see also id.* ¶¶ 3, 32, 36, 40, 45 (describing that Voya has discretionary control to change the Credited Rate of the Separate Account). To support her claim, Ms. Dezelan refers to the Plan's auditor's findings on the Separate Account assets between 2009 and 2014. *Id.* ¶ 56; *see also* Financial Statements Ex. A–C, Opp. Mem., ECF No. 46-1. During these six years, Ms. Dezelan alleges that the Separate Account "earned an additional $14,613,885 in unauthorized Spread compensation[.]" Am. Compl. ¶¶ 56–57. Ms. Dezlean alleges that, due to "the existence of the magnitude of the Spread," Voya must have set a low Credited Rate. *Id.* ¶ 59.

Ms. Dezelan also alleges that Voya "does not disclose the amount of Spread that it earns or that it reasonably expects to receive [from] its retirement plan clients and their respective participants." *Id.* ¶ 3; *see also id.* ¶ 67. Ms. Dezelan further alleges that Voya's non-disclosure works to "effectively prevent[] a Plan from terminating a [Separate Account] in the event Defendant exercises its discretion to impose an unfavorable Credited Rate[.]" *Id.* ¶ 40. Because Voya has the discretion "to determine the matter in which Plans may withdraw from a [separate

6

account stable value fund]," Ms. Dezlean alleges Voya "impose[s] substantial penalties upon participants if an employer terminates . . . and a punitive withdrawal penalty" to design a plan where an employer could not terminate a separate account stable value fund. *Id.* ¶ 43.

Ms. Dezelan further alleges that the Separate Account and Voya's general account are the same. *See id.* ¶ 25. She claims that the funds in the Separate Account are "pooled and invested with the other insurance company general account investments . . . and the investment returns on those pooled investments are allocated to the 'paper' bookkeeping accounts of the [Separate Account]." *Id.* ¶¶ 20–23. Ms. Dezelan suggests that Voya does not need to transfer the Spread profits from the Separate Account into its general account because the Separate Account is not actually separate from Voya's general accounts. *See id.* ¶¶ 25–28; *see also id.* ¶ 23 (alleging that separate accounts' "earnings in excess of the reserve requirements do not have to be held in any particular account and are identical to and fungible with all other insurance company [general account] assets and can be used for any corporate purpose[]").

### B. Procedural History

On July 26, 2016, Ms. Dezelan filed her original action against Voya. In her first Complaint, Ms. Dezelan alleged that Voya unlawfully profited by setting the Credited Rate for its stable value funds for its own benefit. *See, e.g.*, Compl. ¶¶ 92, 104, 111 (describing how Voya received unreasonable compensation by breaching is fiduciary duties in setting and resetting the Credited Rate). Voya moved to dismiss the original Complaint on October 6, 2016. ECF No. 17.

On July 6, 2017, the Court granted Voya's motion to dismiss without prejudice because Ms. Dezelan failed to allege she had invested in a stable account value fund offered by Voya, and "state a claim upon which relief could be granted." Order Granting Mot. to Dismiss at 8, 17, ECF No. 41.

7

On August 3, 2017, Ms. Dezelan filed an Amended Complaint, renewing the same claims. First, Ms. Dezelan alleges that Voya violated Section 406(a)(1)(C) of ERISA, which provides that a fiduciary shall not cause a plan to engage in a transaction, if it knows that the transaction constitutes direct or indirect furnishing of goods or services by a "party in interest to a plan." Am. Compl. ¶ 87 (citing 29 U.S.C. § 1106(a)(1)(C)). Second, she argues that Voya violated Section 406(b)(1) of the law, which prohibits a fiduciary from "deal[ing] with plan assets in his own interest or for his own account." *Id.* ¶ 103 (citing 29 U.S.C. § 1106(b)(1)). Finally, she argues that Voya breached the fiduciary duties it owed to the Plan, in violation of Section 404(a)(1). *Id.* ¶ 113 (citing 29 U.S.C. § 1104(a)(1)).

Ms. Dezelan also seeks to represent a class that includes participants in "all ERISA covered employee pension benefit plans whose plan assets were invested in Voya Retirement Insurance and Annuity Company's Group Annuity Contract stable value funds within the six years prior to, on or after July 26, 2010." *Id.* ¶ 78.

On September 18, 2017, Voya moved to dismiss the Amended Complaint, arguing that Ms. Dezelan failed to plausibly allege that Voya earned excess compensation from the Spread. Def.'s Mot. to Dismiss Am. Compl. at 3, ECF No. 45-1. Ms. Dezelan, however, argues that the Amended Complaint sufficiently alleges that Voya depressed the Credited Rate, failed to amortize the Spread, and kept the Spread as excessive compensation. Opp. Mem. at 2.

## II. STANDARD OF REVIEW

For the purposes of this motion, all non-conclusory factual allegations are accepted as true, and all inferences are drawn in favor of the plaintiff. *See Aschroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court also considers the contract and other documents attached to the motion to dismiss, because the Amended Complaint "'relies heavily upon [their] terms and effect,' which

renders the documents 'integral' to the [Amended] [C]omplaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To state a plausible claim for relief, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In assessing the sufficiency of the Amended Complaint, a district court must draw all reasonable inferences in favor of the non-movant. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007). The Court accepts as true all factual allegations in the complaint, "and then determine[s] whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

"Although courts considering motions to dismiss under Rule 12(b)(6) generally must limit [their] analysis to the four corners of the complaint, they may also consider documents that are incorporated in the complaint by reference." *Kermanshah v. Kermanshah*, 580 F.Supp.2d 247, 258 (S.D.N.Y. 2008). This is particularly true if the Amended Complaint "'relies heavily upon [their] terms and effect,' which renders the document[s] 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)); *see also Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 222 (2d Cir. 2004) (rejecting allegations that were "belied by the letters attached" to the complaint); *L-7*

9

*Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (when reviewing a judgment on the pleadings, courts assume facts alleged are true "unless contradicted by more specific allegations or documentary evidence").

## III. DISCUSSION

Voya moves to dismiss Ms. Dezelan's claims under Rule 12(b)(6), arguing that Ms. Dezelan's claims should be dismissed because Ms. Dezelan failed to "plausibly allege [that] Voya took Spread on the Separate Account assets[.]" Def.'s Mot. to Dismiss Am. Compl. at 10; *see also id.* at 3,12. Specifically, Voya argues that Ms. Dezelan has failed "to plausibly allege the fact the Court deemed critical to any fiduciary breach or prohibited transaction claim related to the Separate Account—that Voya took Spread from the Separate Account assets and used it for its own interests." *Id.* at 13. Ms. Dezelan argues that the Amended Complaint "remedies the deficiency by alleging sufficient facts permitting the Court to draw the plausible inference . . . that [Voya] artificially depressed the Credited Rate and failed to pay Plaintiff and the Class . . . [and] took Spread or used Spread for itself as excessive compensation." Opp. Mem. at 2. The Court disagrees.

### A. Voya's Fiduciary Duties of the Separate Account

Ms. Dezelan claims that Voya violated Section 404(a)(1) of ERISA, which requires a fiduciary's loyalty and prudence, *see* 29 U.S.C. § 1104(a) (describing the "prudent man standard of care"), as well as two sub-sections of Section 406. Specifically, Ms. Dezelan cites Section 406(a)(1)(C), which prohibits a fiduciary from causing "the plan to engage in a transaction [with] a party in interest," *id.* § 1106(a)(1)(C), and Section 406(b)(1), which prohibits a fiduciary from "deal[ing] with plan assets in his own interest or for his own account." *Id.* § 1106(b)(1).

For the purposes of this motion, however, Voya does not contest its status as a fiduciary. Indeed, Ms. Dezelan has sufficiently alleged that Voya had "discretionary control" over the Plan's assets and is a fiduciary under ERISA. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993); *see also Blatt v. Marshall & Lassman*, 812 F.2d 810, 812–13 (2d Cir. 1987) (noting that an entity must "exercise[] *actual* control over the disposition of plan assets," but "need not have absolute discretion with respect to a benefit plan in order to be considered a fiduciary"); Contract § 7.07 ("[i]f the Plan is subject to [ERISA, Voya is] acting as a fiduciary, as defined in section 3(38) of ERISA, solely with respect to the management of Plan funds held in a Separate Account . . . In all other respects, in exercising our rights, we represent ourselves and not the Plan."). Under the Contract, Voya had the authority to invest Separate Account assets in certain "investment vehicles," subject to the constraints set by the Contract. Contract at 24; *see also* Contract § 2.11 ("Amounts in a Separate Account are invested consistent with the investment objectives [Voya] sets for that Separate Account.").

### 1. The Breach of Fiduciary Duty Claim

ERISA provides that a fiduciary has an obligation to discharge its duties, including its investment decisions, "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose" of providing benefits to participants and their beneficiaries. 29 U.S.C. § 1104(a)(1). This duty is broad and informed by both the terms of ERISA and the common law of trusts. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 110–11 (1989). Indeed, ERISA fiduciary obligations are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982), *cert denied*, 459 U.S. 1069 (1982). ERISA requires a fiduciary's "complete loyalty," but fiduciaries "do not violate their duties [to a pension plan] by taking action which, after careful and impartial investigation, they reasonably conclude is best to

promote the interests of participants and beneficiaries," even if the decision "incidentally benefits" the fiduciary. *Id.* at 271.

To state a claim for a violation of fiduciary duty under ERISA, a plaintiff must "plausibly allege[] that a prudent fiduciary in the same position could not have concluded that the alternative action would do more harm than good." *Amgen Inc. v. Harris*, 136 S. Ct. 758, 760 (2016) (internal marks and citations omitted); *Bd. of Trustees of Operating Engineers Pension Trust v. JPMorgan Chase Bank, Nat. Ass'n*, No. 09-cv-9333 KBF, 2013 WL 1234818, at *2 (S.D.N.Y. Mar. 27, 2013) (denying motion to dismiss ERISA duty of loyalty claim when plaintiff pled that the "defendant gambled that [an investment] would survive when it was the Plan's investment at risk [and when the Defendant] stood to . . . profit[] if the investment paid off"); *see also State St. Bank and Trust Co. v. Salovaara*, 326 F.3d 130, 136 (2d Cir. 2003) ("This statutory duty of loyalty has been described by this court as requiring that a fiduciary act, in Judge Friendly's felicitous phrase, with an 'eye single to the interest of the participants and beneficiaries.'") (quoting *Donovan*, 680 F.2d at 271).

An ERISA complaint may rely on "circumstantial factual allegations to show a breach of fiduciary duties under ERISA," as long as the allegations give "rise to a 'reasonable inference' that the defendant committed the alleged misconduct." *Pension Ben. Guar. Corp. Ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (citing *Iqbal*, 556 U.S. 678). "[C]ourts may draw a reasonable inference of liability when the facts alleged are suggestive of, rather than merely consistent with a finding of misconduct." *Id.* (quoting *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013)).

Ms. Dezelan claims concerning the Separate Account have two components. First, she alleges that Voya manipulates the Credited Rate for its own advantage. To support this claim, Ms. Dezelan alleges that Voya was able to receive $14,613,855 in undisclosed Spread compensation between 2009 and 2014 by depressing the Credited Rate of the Separate Account. Am. Compl. ¶ 56.

Second, Ms. Dezelan alleges that Voya kept the Spread by artificially lowering the Credited Rate rather than amortizing the profits from the Spread "through the Credit Rate as required" by the Contract. *Id.* ¶ 59. She suggests that "the gains and losses should have been amortized" and the profits should have been returned to the "participants through the Credited Rate within 5.75 years[.]" *Id.* ¶ 58. To support this claim, Ms. Dezelan alleges that Voya holds the Spread's profits within "Defendant's other general account assets[,]" which is "fungible with Defendant's other general account assets and used for general corporate purposes." *Id.* ¶ 60. She argues that Connecticut laws allow insurance companies to hold separate account assets in its general account. Opp. Mem. at 8–9 (citing Regs. Conn. State Agencies § 38a-459-12(d)(6)(D)) (referring to "the manner in which account assets shall be allocated between the separate account, any supplemental account, and the general account"); *see also id.* § 38a-459-16(a) ("An insurance company, at all times, shall hold sufficient assets in the general account, the separate account, or supplemental accounts, as appropriate, such that the value of the account assets, valued as if the assets were held in the insurance company's general account, equals or exceeds the reserve required for contracts supported by the separate account, determined as if the contracts were held in the general account."). As Ms. Dezelan has previously conceded in oral argument, however, the Contract does not allow for Voya to keep Separate Account assets, or

13

take the Spread, before the Contract's termination. *See Dezelan v. Voya Ret. Ins. and Annuity Co.*, No. 3:16-cv-1251, 2017 WL 2909714, at * 11 (D. Conn. July 7, 2017).

Ms. Dezelan's Amended Complaint does not remedy this problem. She still has not plausibly alleged that Voya keeps the Spread that it earns from the Plan's Separate Account assets in its own account. In the Amended Complaint, Ms. Dezelan compiles the 2010, 2012, and 2014 financial statement produced by the Plan's auditor to allege the existence of the Spread and Voya's unreasonable and undisclosed compensation. Opp. Mem. at 56–58; *see also, e.g.*, *id.* at Ex. A–C. These allegations fall short, however, of stating a plausible claim. In this Court's previous ruling to dismiss Ms. Dezelan's original Complaint, the Court held that, "even if the Court concluded that Voya artificially depresses the Crediting Rate and creates a Spread, it cannot conclude from the allegations made that the Spread goes to Voya instead of remaining in the Separate Account." *Dezelan*, 2017 WL 2909714, at * 11. The chart of the Separate Account's earnings from 2009–2014 merely provides further clarification of Ms. Dezelan's allegation that the Spread existed. Compl. ¶ 3, ECF No. 1; *see also* Am. Compl. ¶ 3. It fails, however, to demonstrate that Voya kept the Spread. As a result, these allegations do not provide "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

Additionally, the Contract does not require that the Separate Account's gains and losses are amortized within six years, as Ms. Dezelan suggests. And Ms. Dezelan does not reference a specific section in the Contract that requires a six-year portfolio term. *See* Am. Compl. ¶ 31, 58. Ms. Dezelan's allegations may be based on the notion that Voya's investment objective is "to outperform the Barclay Capital U.S. Aggregate bond Index[,]" *id.* ¶ 15 (citing Contract at 19), because the Contract states that Voya's strategy for the Separate Account is "to outperform the Barclays Capital U.S. Aggregate Bond Index by 50 basis points[.]" Contract at 19; Am. Compl. ¶

14. The Barclay Capital U.S. Aggregate Bond Index has a 5.75-year term. Am. Compl. ¶ 15. The Contract, however, does not suggest that the Separate Account has the same term length as the Barclay Index's 5.75-year term. *See* Contract at 19; *see also* Def.'s Mot to Dismiss Am. Compl. at 12. Ms. Dezelan therefore cannot plausibly suggest that Voya breached its fiduciary duty by not amortizing the Separate Account's gains and losses.

Ms. Dezelan's allegations thus do not give rise to a reasonable inference of Voya's misconduct, *see Pension Ben.*, 712 F.3d at 718, and the Court therefore must grant Voya's motion to dismiss Ms. Dezelan's claim under Section 404(a) of ERISA.

### 2. The Unreasonable Compensation Claim

In addition to a general fiduciary duty of loyalty and prudence, ERISA also treats specific types of transactions between a plan and related persons, or "parties in interest," as inherently susceptible to abuse. These transactions are prohibited in Section 406 of ERISA. *See* 29 U.S.C. §1106; *see also Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241–42 (2000) (citation omitted) (noting that Congress "supplement[ed]" ERISA's general duty of loyalty by enacting 29 U.S.C. § 1106, which "categorically bar[s] certain transactions deemed likely to injure the pension plan"). The Second Circuit has held that courts should interpret Section 406 broadly in favor of plan beneficiaries and that a violation of the provision of ERISA may be demonstrated without a showing of bad faith or even in the presence of a reasonable transaction. *See Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987). It also places the "burden of proof . . . on the party to the self-dealing transaction to justify its fairness." *Marshall v. Snyder*, 572 F.2d 894, 900 (2d Cir. 1978).

Ms. Dezelan invokes Section 406(a)(1)(C), which prohibits transactions "if [the plan] knows that the transaction constitutes the payment . . . of services between a party in interest to a

plan," and Section (b)(1), which prohibits fiduciaries from "deal[ing] with plan assets in [their] own interests." *See* 29 U.S.C. § 1106(a)–(b). The factual allegations in the Amended Complaint, however, fall short, just as the similar, if not the same, factual allegations did in the original Complaint.

### a. Section 406(a)(1).

Under Count I, Ms. Dezelan claims Voya violated Section 406(a)(1)(C) because it "received compensation in the form of income and a specific expense charge in exchange for the services it provided to the Plans." Am. Compl. ¶ 90. To state a claim under Section 406(a)(1), the plaintiff must allege that a fiduciary made an expenditure to a party in interest, which then shifts the burden to the fiduciary to show that the expenditure was reasonable. *N.Y. State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*, 18 F.3d 179, 183 (2d Cir. 1994); *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009) (noting that the plaintiff "does not bear the burden of pleading facts showing that the revenue sharing payments were unreasonable in proportion to the services"). Fiduciaries or other "person[s] providing services" to a benefit plan are considered parties in interest under Section 406(a). 29 U.S.C. § 1002(14)(A)–(B).

A claim under Section 406(a) therefore can survive a motion to dismiss if it suggests that a fiduciary made payments or diverted funds to a party in interest. In *Braden*, for instance, the Eight Circuit found sufficient the plaintiff's allegation that the defendant received "revenue sharing payments [that] far exceeded the value of services actually performed" and "kickbacks" in exchange for investing in certain mutual funds. *Braden*, 588 F.3d at 600; *see also Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15 CIV. 9936 (LGS), 2016 WL 5957307, at *1 (S.D.N.Y. Oct. 13, 2016) (declining to dismiss the plaintiff's claims under Section 406 because

16

the plaintiff had specifically alleged that the fiduciaries invested in Deutsche Bank's "proprietary index funds," which "charged fees that were more than eleven times higher than a comparable Vanguard index fund," from which the fiduciaries—as subsidiaries of Deustche Bank—stood to benefit); *Grodotzke v. Seaford Ave. Corp.*, 17 F. Supp. 3d 185, 193–94 (E.D.N.Y. 2014) (declining to dismiss a claim plaintiffs had alleged that fiduciaries "diverted" plaintiffs' assets "for their own personal use and benefit," by keeping money from construction projects that, under their contract with the plaintiffs, should have been forwarded to the plaintiffs).

In contrast, Ms. Dezelan alleges that the investments deposited into the Separate Account are "pooled and invested" with Voya's general account. Am. Compl. ¶ 20. As opposed to her original Complaint, here Ms. Dezelan does not allege that Voya "transferred" funds from the Separate Account to its general account. *See* Compl. ¶ 34. Rather, she suggests that Voya essentially "deposits" the excess funds into its general account because "it is simply a matter of allocation in [Voya's] books and records" since Voya "owns all of the separate account assets, regardless of whether they are held in the Separate Account or the General Account." Opp. Mem. at 9; *see also* Am. Compl. ¶ 25. She suggests that because Voya owns the assets of the Separate Account, it keeps those assets in its general account rather than in the Separate Account as stated in the Contract. *See id.* ¶¶ 25–28.

Ms. Dezelan also notes that Connecticut law allows insurance companies to hold the excess of the Separate Account assets in its own account and retain the Spread if the Contract is discontinued. *See* Regulation of Connecticut State Agencies (RCSA) § 38a-459-16(a)–(b). Ms. Dezelan suggests that the reserve amount that Voya has kept exceeds the amount required by § 38-a-459-16(a). Opp. Mem. at 9; Am. Compl. ¶ 60. She suggests that, for Voya to comply with

17

Connecticut law, Voya would have to move the excess funds (the Spread) into its general account or "some other account." Opp. Mem. at 9.

But again, as with her original Complaint, Ms. Dezelan has not alleged facts that suggest that Voya has abused its discretion by retaining any Plan assets. She does not allege a specific instance when Voya "divested" the Plan assets or used Plan assets "for [its] own personal use and benefit." *Grodotzke*, 17 F. Supp. 3d at 193. She simply alleges that Connecticut law gives Voya the discretion to keep the Spread and it "likely" does so because it "must [to comply with Connecticut law] have allocated this excess Spread to either its general account or some other account." Opp. Mem. at 9; *see also* Regs. Conn. State Agencies § 38a-459-16(b) ("If the account contract . . . provides that the assets in the separate account shall not be chargeable with liabilities . . . the insurance company shall maintain in a supplemental account or the general account the amount of any account assets in excess"). Specifically, Ms. Dezelan states that "[i]t is simply implausible that [Voya] . . . would leave tens of millions of dollars sitting in a separate account for absolutely no purpose when Connecticut law permits it to use that money for other corporate purposes." Opp. Mem. at 18. Section 38a-459-16(b) does not permit an insurance company to use the excess assets placed in its general account for "corporate purposes." Ms. Dezelan again asks the Court to presume that Voya engaged in a prohibited transaction merely because it had the ability to do so. *See* Order Granting Motion to Dismiss at 23, ECF No. 41. The Court, again, will decline to do so.

While ERISA's prohibited transaction provision is broad, and demands "complete loyalty" to Plan participants, *Donovan*, 680 F. 2d at 271, the Amended Complaint "must give rise to a reasonable inference that the defendant committed the alleged misconduct." *Pension Benefit*, 712 F.3d at 718. Ms. Dezelan's Amended Complaint has failed to meet this burden.

### b. Section 406(b)(1)

Under Count II, Ms. Dezelan claims Voya violated Section 406(b)(1) because "[i]n setting and resetting the Credited Rates applicable to the [Separate Account] . . . Defendant deals with plan assets in its own interest or for its own account." Am. Compl. ¶ 104. Section 406(b)(1) of ERISA prohibits fiduciaries from "deal[ing] with the assets of the plan in [their] own interest[s] or for [their] own account[s]." 29 U.S.C. § 1106(b)(1). The provision prohibits fiduciaries from "paying themselves from Fund assets." *Whitfield v. Tomasso*, 682 F. Supp. 1287, 1304 (E.D.N.Y. 1988); *see also LaScala v. Scrufari*, 330 F. Supp. 2d 236, 254 (W.D.N.Y. 2004), *as amended on reconsid.* (July 23, 2004) (noting that Section 406(b)(1) "suggests that a fiduciary, normally permitted to receive reasonable compensation for services rendered . . . may not if self-dealing is involved in the transaction securing the payment"). Liability may be imposed under § 1106(b) "even where there is no taint of scandal, no hint of self-dealing, no trace of bad faith." *Lowen*, 829 F.2d at 1213 (internal citations omitted).

As with the original Complaint, this Court must, however, determine whether the Amended Complaint states a claim upon which relief can be granted. Ms. Dezelan argues that Voya violated Section 406(b)(1) by "compensating" itself by keeping the Spread. *See* Am. Compl. ¶¶ 103–104. Again, as explained above, Ms. Dezelan does not plausibly allege that Voya ever kept the Spread. Her claim under Section 406(b)(1) therefore must be dismissed as well.

Because the Court has given Ms. Dezelan leave to amend her Complaint once, the Court will not grant further leave to amend her Complaint and will dismiss this case with prejudice. *See, e.g.*, *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (affirming dismissal with prejudice because, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of [the district court's] discretion to deny leave to amend");

*Ganley v. City of New York,* No. 17-1704, 2018 WL 2383533, at *2 (2d Cir. May 25, 2018) (noting that district court granted "leave to amend when it dismissed his original complaint, and it provided a detailed explanation of the deficiencies he should address" and therefore "was not required to give Ganley another opportunity to address the same deficiencies").

## IV. CONCLUSION

For the reasons discussed above, Voya's motion to dismiss is **GRANTED**.

The Clerk of the Court is instructed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 17th day of August, 2018.

                                                  /s/ Victor A. Bolden
                                                  VICTOR A. BOLDEN
                                                  UNITED STATES DISTRICT JUDGE